In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2698

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JERMAINE L. LEE,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 08 CR 10030—**Michael M. Mihm**, *Judge*.

ARGUED APRIL 12, 2010—DECIDED AUGUST 20, 2010

Before CUDAHY, POSNER, and EVANS, *Circuit Judges*.

CUDAHY, *Circuit Judge.* On April 4, 2008, Jermaine Lee was arrested on charges of conspiracy to distribute crack cocaine, distribution of crack cocaine and possession with intent to distribute crack cocaine. Approximately six hours after being brought into custody, three police officers, who had just conducted a search of a co-defendant's house, interviewed Lee from 12:05 a.m. until 1:28 a.m. The officers began the interview by asking questions from a personal-history report, which con-

sisted of two pages. The first page contained information about Lee's nicknames, recent addresses, height, weight and social-security number. Sergeant Brian Gorsuch, one of the interrogating officers, asked Lee all of the questions from this page and filled in answers for each one. To this first page, Gorsuch also added that Lee was a member of the Gangster Disciples street gang. The second page consisted of questions about marital status, parents, siblings, children, military experience, outstanding loans, as well as prior arrests, drug usage, drugs associates and sources of income. Save for some biographical information on Lee's children, it would seem that the answers on this page were left blank. Having filled out the noted portions of the personal-history report, the officers read Lee his *Miranda* rights. Lee signed a *Miranda* waiver and then proceeded largely to cooperate with the officers by answering most of their questions.

During the interview, Lee made several incriminating statements. Having contemplated the prudence of his confession in the minutes following the end of the interview, Lee wrote a letter to Gorsuch. In that note, Lee stated that he had admitted to things he had not done and wished to take back everything he had said. Prior to trial, Lee filed a motion to suppress the incriminating statements, alleging that the statements were made in violation of his constitutional rights. Specifically, Lee alleged that the government failed to show that Lee understood his *Miranda* rights upon signing the *Miranda* waiver, that the officers had coerced him into providing incriminating statements and that the officers had conducted an illegal two-step interrogation proce-

dure, which rendered his *Miranda* rights ineffective. The district court denied Lee's motion to suppress.

Following a bench trial, Lee was found guilty on all counts. Lee appeals his conviction, arguing that the district court erred, first, in finding that he had effectively waived his constitutional rights; second, in determining that his statements to the police were voluntary and; third, in refusing to grant his motion to suppress the statements he had made during his interrogation. Lee contends that the district court's alleged errors were not harmless beyond a reasonable doubt.

We affirm. Assuming arguendo that Lee's incriminating statements were obtained in violation of his constitutional rights, the court's failure to suppress those statements was harmless beyond a reasonable doubt. The district judge made clear that his holding stood regardless whether the incriminating statements were suppressed. He was emphatic in insisting that the government had proven its case beyond a reasonable doubt independent of those statements. Since the present case involves a bench trial, and because the district judge's explicit elucidation forecloses any realistic prospect that he would have found Lee not guilty, any error was harmless. In addition, we believe that the district court was correct in holding that Lee's constitutional rights were not violated.

# I. BACKGROUND

On April 4, 2008, Lee was arrested on charges of conspiracy to distribute crack cocaine, distribution

of crack cocaine and possession with intent to distribute crack cocaine. Evidence supporting these allegations consisted of the testimony of several people who were involved in drug transactions with Lee: Jeffrey Smith (Lee's cousin); Clyde White (one of Lee's co-defendants); and Bernard Murray, Cathy Lewis and Erin Kempker (three of Lee's customers). While working for law enforcement, Cathy Lewis sound- and video-recorded three of the drug transactions that took place between herself and Lee.

In October 2005, Lee arranged for Smith to establish a residence in Macomb, Illinois. The residence was to be used to distribute drugs to several of Lee's customers located in Macomb. For several years, Smith worked on and off for Lee delivering crack cocaine to approximately seven of Lee's customers in Macomb and accompanying Lee to buy powder cocaine from two suppliers, initially a man named Tony and later Lee's brother.

Lee also sold crack cocaine directly to several individuals including Murray, White and Lewis. In spring 2006, Lewis began working for law enforcement as a confidential informant. In that role, Lewis recorded three drug sales between herself and Lee occurring on August 29, 2006, September 27, 2006 and December 4, 2007.[1]

---

[1] On August 29, 2006, at the direction of law-enforcement officials, Lewis called "Tamar," a man already under investigation, to set up a drug deal. Tamar referred Lewis to Lee.

(continued...)

Lee's arrest, which led to the conviction from which he presently appeals, occurred on April 4, 2008. That day, White and Kempker bought crack cocaine from Lee. The three then drove to Good Hope, Illinois, so Lee could purchase drugs from Terrance Guyton-Whitler. Guyton-Whitler, while driving alone and having just sold drugs to Lee, was pulled over by the police. The police found $1,083 on Guyton-Whitler, as well as $8,000, a digital scale, 6.3 grams of powder cocaine and 15.3 grams of crack cocaine in his glove compartment. While Guyton-Whitler was at the Sheriff's office, Kempker and White smoked the crack that Guyton-Whitler had sold to Lee. They found that the crack was bad. Not knowing that Guyton-Whitler was at the Sheriff's office, Lee called Guyton-Whitler to fix the problem. Cooperating with the police, Guyton-Whitler arranged to meet Lee back in Good Hope. Kempker agreed to drive him to Good Hope, but before leaving Kempker's home, Lee went into a child's bedroom alone and exited shortly after. On their way to Good Hope, Lee and Kempker were pulled over by police officers and arrested. According to an officer's testimony, Lee was

(...continued)

Following Lewis's initial discussion with Lee, the two met in a parking lot in Macomb where Lewis gave Lee $200 in exchange for 2.9 grams of crack. On September 27, 2006, Lewis purchased 5.8 grams of crack cocaine from Lee for $600. On December 4, 2007, Lewis met Lee at White's trailer in Macomb, where she purchased 3.1 grams of crack cocaine from him.

advised of his *Miranda* rights upon his arrest, and when asked if he understood those rights, Lee responded that he did. After questioning Kempker back at the police station, police officers obtained a warrant to search her home. There they discovered baking soda, numerous plastic baggies and a plate with a powdery white substance in the kitchen. They also found 20.5 grams of crack cocaine in the closet of a child's bedroom.

Lee waited in a jail cell until the police officers were done searching Kempker's home. At about midnight, the officers returned and interviewed Lee. To begin the interview, Lee was asked questions from a two-page "Personal History Report"—his responses were recorded in writing by the officers. Apparently, it was typical procedure for the officers to ask questions from the personal-history report before giving a *Miranda* warning. The first page, which sought information regarding the suspect's nicknames, recent addresses, height, weight, and social-security number, was completed in its entirety by Sergeant Gorsuch. The officer also wrote in Lee's gang affiliation. The second page contained questions about marital status, siblings, children, military experience, outstanding loans, prior arrests, drug usage, drug associates and various sources of money. Although this page is not part of the record presently before us, Lee's attorney announced in a hearing that the page was left blank except for biographical information concerning Lee's children.

Having filled out the noted portions of the personal-history report, Gorsuch read Lee his *Miranda* rights. The

officer did not recall reading aloud the line on the form that states: "I understand my rights and am willing to answer questions." Gorsuch then filled in Lee's name, marked an "X" where Lee needed to sign and asked Lee if he would sign the waiver. Lee took the waiver form from the officers. According to Gorsuch's testimony, it appeared that Lee read the waiver line before signing the waiver and handing it back to him.

After signing the *Miranda* form, Gorsuch began to ask Lee questions about events leading up to his arrest. Several minutes into this discussion, Gorsuch asked Lee if he could record the interview. Lee consented. At the start of the recording, Gorsuch stated that Lee had consented to the recording, had been advised of his *Miranda* rights and had admitted that he had been bringing an ounce of crack from Chicago each week since 2005 and had been selling it to several customers in Macomb. Lee immediately retorted that he had only sold powder cocaine, never crack. Gorsuch said that he knew Lee was lying and reminded him that he had two children and needed to think about his future. He also told Lee that he knew he had sold crack because Lee had been recorded on video and audio selling it. Lee continued to deny selling crack. Gorsuch again accused Lee of lying and informed him that whether he would face additional charges depended on his cooperation. Gorsuch also informed Lee that the additional charges he faced would be worth three years in state court and five years in federal court, and suggested that Lee's arrest could "either stay in state court or the U.S. Attorney's office may be interested in it." The officers further

informed Lee of the crack they had found in the children's room at Kempker's home, and stated that they had seized the money they had found on Guyton-Whitler and that they had prints and witnesses, including Kempker, which would prove he was lying. Lee then admitted that he had bought powder cocaine, cooked it and sold it as crack cocaine in Macomb.

The discussion subsequently turned to the topic of Tamar, from whom Lee said he had never been able to buy drugs. During this conversation, Lee told the officers that he had decided to cooperate with them while he was waiting in his jail cell before the interview "cause of my kids."

When the officers began asking Lee questions about the crack found at Kempker's home, Lee stated that he had paid Guyton-Whitler $1,000 for an ounce of crack, had re-cooked it and had given it to White to hide. Lee also discussed his involvement with Bernard Murray, as well as two other possible drug dealers. At the conclusion of the interview, the officers asked Lee if they could search his cell phone without a warrant. Lee declined their request.

Six minutes after the end of the interview, Lee wrote a letter to Gorsuch taking back the statements he had made during the interview, asserting that he had admitted to things that he had not done.

In June 2008, while awaiting a court appearance, Lee told a temporary cellmate that he had bought some bad crack and that, while he was driving to get his money back, he had been pulled over and arrested. Lee further

told his cellmate that, although the crack was his, he refused to take the blame for it because it was not on his person when it was found.

Prior to trial, Lee moved to suppress the incriminating statements he had made during the interview. He claimed that the police had violated his *Miranda* rights and had coerced him into providing the statements that he had made. Specifically, Lee argued that he had been denied his *Miranda* rights because the police failed to ensure that he understood those rights before signing the waiver and because the officers failed to advise him that the statements he had made prior to being given his *Miranda* rights could not have been used against him.

The district court denied Lee's motion to suppress. The court found that, by having his *Miranda* rights read to him and by having signed the waiver, Lee understood his rights. The district court found troubling Gorsuch's statements about Lee's children, about Lee's having "a lot at stake" and about charging decisions potentially depending on Lee's cooperation. Nevertheless, the court found that his statements were not coerced because Lee did not appear to have been "browbeaten" at any point during the videotaped interview. The court also noted instances in which Lee was unwilling to co-operate with the officers, which suggested that the police had not coerced him into providing cooperative statements.

At the bench trial, Lee's testimony contradicted that of the government's witnesses. Lee denied selling any

drugs, and instead stated that he had only used crack cocaine. Lee testified that he moved in with Jeffrey Smith in 2005 and that Smith dealt drugs while Lee cut hair as a barber. With regard to the three recordings, Lee testified that Smith, not Lee, had delivered the drugs to Lewis on August 29, 2006. He also testified that he had met with Lewis on September 27, 2006, but only to receive money she owed him. He testified further that Lee was already at Clyde White's trailer getting high when Lewis came over on December 4, 2007 and that the male voice on the recording of December 4 was White's voice, not his own. Lee also contended that, on April 4, 2008, White had ordered drugs from Guyton-Whitler and either Kempker or White, not Lee, had received those drugs in Kempker's car that day. He also asserted that, once back at Kempker's home, Lee snorted powder cocaine and drank while White cooked raw cocaine into crack. When they decided that the drugs were no good, White sent Kempker and Lee back to meet Guyton-Whitler.

The district judge found Lee guilty on all five counts. The judge noted that he viewed the government's co-conspirator witnesses with caution and great care but found them to be credible for the most part and found Lee not to be credible. The judge also made it clear that in making his decision he found that the government had proven its case beyond a reasonable doubt without taking into consideration the statements Lee sought to have suppressed. For that reason, the judge emphasized that his holding would remain the same even without taking Lee's confession into consideration.

## II. DISCUSSION

Lee argues on appeal that his post-arrest statements should have been suppressed because they were made in violation of his constitutional rights. He contends that those rights were violated because the police officers who interviewed him failed to ensure that he understood his *Miranda* rights before he waived them. He also argues that they coerced him into providing his post-arrest incriminating statements and that they conducted a two-step interrogation procedure that rendered the *Miranda* warning ineffective. Lee submits that the district court's failure to suppress those incriminating statements was not harmless beyond a reasonable doubt.

When reviewing a district court's determination on a motion to suppress, we review conclusions of law de novo and factual determinations for clear error. *United States v. Figueroa-Espana*, 511 F.3d 696, 701 (7th Cir. 2007). When cases present errors that infringe on constitutional rights, we will not uphold the district court unless the constitutional error is harmless beyond a reasonable doubt. *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1016 (7th Cir. 1987). An error is harmless if the prosecution can prove beyond a reasonable doubt that the constitutional error did not contribute to the verdict. *Hunter v. Clark*, 934 F.2d 856, 859 (7th Cir. 1991) (quoting *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988)). In the present case, assuming arguendo that Lee's constitutional rights were violated, we find such error to be harmless in light of the fact that the district court would not have reached a different result but for the alleged

error. In other words, any alleged constitutional viola-
tion was harmless beyond a reasonable doubt.

### A. Assuming arguendo that the district court's denial of Lee's motion to suppress his incriminating statements amounted to a violation of his constitutional rights, such an error was harmless beyond a reasonable doubt.

Even if we were to assume that the district court im-
properly denied Lee's motion to suppress the statements
he made during his interrogation, such an error would
be harmless beyond a reasonable doubt.

This conclusion is almost inescapable in light of the
district judge's emphatic statements that the govern-
ment had met its burden of proof even without any
evidence pertaining to the defendant's confession. Im-
portantly, the present case involves a bench trial. The
district court, in its role as fact finder, could not have
been clearer in its emphasis that the government had
proven its case beyond a reasonable doubt without
taking into consideration the incriminating statements
Lee sought to have suppressed. The judge observed at
the outset that: "I denied the motion and still feel that
it was the correct ruling, but I want to make it clear at
the beginning of my comments that as far as I'm con-
cerned the Government has proven its case beyond a
reasonable doubt without the, quote, confession, un-
quote." To eliminate any doubt, he concluded his
holding by asserting that: "I will end with the point that
I started with and that is that this result accrues even

by totally disregarding the things that he admitted to in the interview."

While Lee argues that it cannot be certain that his incriminating statements had no effect on the judge's decision, it is hard to credit that argument in light of the judge's insistent remarks. *See, e.g.*, *United States v. Miller*, 800 F.2d 129, 136 (7th Cir. 1986) (observing that, in a bench trial, "the district court is presumed to have considered only relevant and admissible evidence in reaching its factual findings" and holding that where "[t]he trial court specifically stated it would disregard the disputed evidence from its evaluation of defendant's guilt, . . . despite any court's 'many human frailties,' we must take that statement as true").

Any lingering doubt is removed by considering the noninterrogation-based evidence of Lee's guilt. This evidence makes clear that the district judge's preceding remarks were well founded, having been derived from a record that strongly establishes the defendant's guilt. There was powerful evidence of Lee's guilt on all counts. *Cf. Hunter v. Clark*, 934 F.2d 856, 860 (7th Cir. 1991) (holding that "[w]hile [the defendant's] trial was not perfect, and we might add, very few are, any error was harmless in view of the overpowering evidence of his guilt.").

In the present case, the government has presented more-than-sufficient evidence, mainly in the form of witness testimony, to convict Lee on all counts without taking into account his incriminating statements. The government was able to produce five witnesses, all of whom

testified to Lee's having been involved in various drug transactions. The district court also found the testimony of the government's witnesses to be more reliable and credible than Lee's contradictory testimony. The judge noted that the testimonies of the government's witnesses were "in all important ways . . . completely internally consistent." Not only are judges allowed to find statements reliable when "they are generally consistent, both internally and with the remainder of the evidence," *United States v. Westmoreland*, 240 F.3d 618, 630 n.4 (7th Cir. 2001), but deference is accorded to the judge who "had the opportunity to hear the testimony and observe the demeanor of the witnesses." *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir. 2001).

In support of Count I—conspiracy to distribute crack cocaine—the government presented ample evidence to establish Lee's guilt beyond a reasonable doubt. *See United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010) (stating that "sales of large quantities of drugs, repeated and/or standardized transactions, and a prolonged relationship between the parties constitute circumstantial evidence of a conspiracy"). Jeffrey Smith, Lee's cousin, worked on and off for Lee for several years. His tasks involved distributing drugs he received from Lee to several of Lee's customers in Macomb and returning the profits to Lee. Smith would also occasionally accompany Lee to buy drugs from two distributors, first a man named "Tony" and later Lee's brother. Two customers, Bernard Murray and Clyde White, bought drugs directly from Lee. White would often pool his money with other buyers, including Cathy Lewis, in

order to buy drugs from Lee. The district court found the testimony of these witnesses to be credible because Lee often traveled from Chicago to Macomb and had several friends in Macomb. The judge also thought that the fact that Lee did not own a car or property in Macomb was merely a tactic that would allow Lee to "maintain as much of a degree of deniability as he could concerning his conduct."

With respect to Counts 2, 3 and 4—three counts of distribution of crack cocaine—the government presented the testimony of Cathy Lewis and the recordings she made of several drug transactions between herself and Lee. Not only did the district court find Lewis's testimony credible, but the three recordings she made on August 29, 2009, September 27, 2006 and December 4, 2007 substantially corroborates her testimony. Despite Lee's attempt to point out weaknesses in the reliability of these recordings, we are not persuaded. Although there is no picture of the defendant and very little conversation on the August 29 recording, the district court thought that the name "J," which was mentioned by "Slick" on the recording, referred to Lee. Further, even though Lee alleged that during the September 27 transaction he was simply collecting a debt, the district judge believed that Lee's reference to $6 really meant $600, and that when he told Lewis to "put it up" he was telling her to put away the drugs he had just given her. Lewis's testimony, along with her recordings, was sufficient evidence to convict Lee on Counts 2, 3 and 4.

Count 5—possession with intent to distribute—was supported by the testimony of Clyde White and Erin Kempker. Both witnesses testified that Lee had bought drugs from Guyton-Whitler, distributed those drugs at Kempker's home and gone into a child's room, where the police later found 20 grams of crack, before leaving for Good Hope. Lee also discussed with his temporary cellmate that the crack in Kempker's house was his, but that he was not going to take responsibility for it.

Since the government presented ample evidence independent of the confession to convict Lee beyond a reasonable doubt on all counts, and, because the district judge made abundantly clear that his finding would stand even "by totally disregarding the things that [Lee] admitted to in the interview," any error in failing to suppress Lee's confession was harmless beyond a reasonable doubt.

This conclusion is dispositive of the present appeal. Nevertheless, we proceed to point out that, in any event, no violation of Lee's constitutional rights took place.

## B. The district court did not violate Lee's constitutional rights.

Even though any error in admitting evidence of Lee's confession was harmless, it bears emphasizing that Lee's constitutional rights do not, in any event, appear to have been violated. The record strongly suggests that Lee understood his rights and knowingly signed a *Miranda* waiver, that his statements made during the custodial

interview were not coerced and that the officers did not use a two-step interrogation procedure that rendered *Miranda* warnings ineffective.

First, Lee argues that his constitutional rights were violated because there was no showing that he understood them when he signed the *Miranda* waiver and hence executed a knowing and intelligent waiver of those rights. We review de novo the district court's finding that Lee's waiver of his *Miranda* rights was knowing and voluntary, but we review the district court's findings of historical fact for clear error. *United States v. Doe*, 149 F.3d 634, 639 (7th Cir. 1998). The waiver inquiry has two distinct dimensions: waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

Lee was read his *Miranda* rights and given a *Miranda* waiver to sign immediately after. Lee took the form and signed next to the "X." According to Sergeant Gorsuch's testimony, Lee appeared to read the waiver line after being handed the waiver form. Nothing in that sequence of events suggests that Lee's act of signing the waiver was involuntary or that he did not understand the rights that were read to him. There is nothing in the record to suggest that Lee did not understand his rights or that he was in some way forced to sign the waiver. Moreover,

after being read his *Miranda* rights, Lee voluntarily answered many of the officers' questions. Willingness to answer questions, even in the absence of a signed waiver, can be viewed as impliedly waiving one's rights. *United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000) (holding that "a *Miranda* waiver need not be express. It may be inferred from a defendant's understanding of her rights coupled with a course of conduct reflecting her desire to give up her right to remain silent"); *Berghuis*, 130 S. Ct. at 2262. In the present case, not only was Lee read his *Miranda* rights, but he signed the *Miranda* waiver voluntarily and continued to cooperate in answering the officers' questions thereafter.

Second, Lee argues that his constitutional rights were violated because his statements made during the custodial interview were coerced. Specifically, Lee alleges that the officers improperly pressured him into confessing by magnifying his fears of not being able to see his children, making false promises of leniency, threatening to bring charges in federal court if he did not cooperate, threatening to communicate any lack of cooperation to the prosecutor and repeatedly accusing Lee of being a liar.

The voluntariness of a confession is a question of fact for the district court, not a legal determination for this Court. *United States v. Murdock*, 491 F.3d 694, 699 (7th Cir. 2007). We have held that a confession is voluntary if, under all the circumstances, it is the "product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive

interrogation tactics that have overcome the defendant's free will." *United States v. Carson*, 582 F.3d 827, 833 (7th Cir. 2009) (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)).[1]

Although the district judge noted with some disapproval one officer's statements that Lee "had a lot at stake" and that he had three young children to think about, the judge did not believe that Lee had been "browbeaten" in any way throughout the duration of the recorded interview. The judge noted that there were even several occasions when Lee was unwilling to agree with the officers, such as his refusal to admit that he has been convicted of a previous felony, his refusal to admit to selling drugs to a particular person and his refusal to allow the officers to search his phone without a search warrant. The district judge correctly characterized such resistance as being inconsistent with Lee's having been pressured to the point where his statements were no longer "the product of a rational intellect and free will." *Carson*, 582 F.3d at 833 (quoting *Dillon*, 150 F.3d at 757). Additionally, Lee himself stated that he had already decided that he would cooperate with the

---

[1] Relevant factors to consider when determining whether a confession is coerced include, but are not limited to, whether the defendant received *Miranda* warnings; the defendant's age, intelligence level, education and mental state; the conditions under which the defendant was interrogated (i.e., duration, environment and access to restroom facilities and food); and whether the defendant was physically punished. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

officers while he was waiting in his jail cell before the interview. Thus, we agree with the district court that Lee was not coerced into providing incriminating statements during his interrogation.

Last, Lee argues that his constitutional rights were violated by the officers' using a two-step interrogation procedure that rendered his *Miranda* warning ineffective. Specifically, he alleges that because the officers asked Lee questions on various "incriminating topics," read him his *Miranda* rights and then continued to question him without informing him that the statements he made before his *Miranda* rights were read could not be used against him, they had used an illegal, two-part interrogation procedure. However, the procedure employed by the officers was not a two-step procedure because the questions asked before the *Miranda* rights were read to Lee may not permissibly be considered part of the interrogation.

A district court's ultimate decision to admit a confession is ordinarily reviewed de novo, but the district court's underlying fact findings are reviewed for clear error, especially when the suppression decision turns on the credibility of witnesses. *United States v. Stewart*, 536 F.3d 714, 719 (7th Cir. 2008). The question whether the interrogating officer deliberately withheld *Miranda* warnings as part of a two-step interrogation process will invariably turn on the credibility of the officer's testimony in light of the totality of the circumstances. *Id*. at 719-20.

*Miranda* rights come into play when a person is in custody and subject to express questioning, or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980); *see also id.* at 301 ("The term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."). Thus, a *Miranda* violation does not occur when officers question a defendant only to a limited extent for personal data required as part of the processing normally attendant to arrest and custody since these types of questions would not reasonably be expected to elicit incriminating responses. *United States v. Kane*, 726 F.2d 344, 349 (7th Cir. 1984).

In the present case, it is unclear from the record what specific questions were asked to obtain personal-history information. We do know that the entire first page of the report was filled out, and that the entire second page, except for biographical questions about Lee's children, appears to have been left blank. In addition, Sergeant Gorsuch's testimony indicates that the only potentially incriminating question Lee was asked prior to his being read his *Miranda* rights was a question related to his drug associates, and even the answer to that was left blank on the personal-history report. While this could be problematic in light of its incriminatory potential, we assume without deciding that such a question need not always be impermissible pre-*Miranda*. *See, e.g.*, *United States v. Washington*, 462 F.3d 1124, 1132-33 (9th Cir. 2006)

(holding that, because agents routinely obtain gang-moniker and gang-affiliation information in order to ensure prisoner safety, such information is routinely part of gathering background information, and not part of the interrogation process). Regardless, and as we proceed to explain, there is no evidence that Lee's answer to that question—assuming it were in fact asked and answered—yielded incriminatory information that was in fact used to garner incriminatory statements post-*Miranda* warning.

Even if the officers did ask incriminating questions in the first part of a two-step interrogation without apprising Lee that those statements could not be used against him, the facts of this case fail to meet the require-ments of either of the two variants of the *Seibert* test, which is used to determine when questioning that is alleged to be part of a two-step interrogation is imper-missible. *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, a confession was obtained during a police inter-rogation in which *Miranda* rights were not read until after the defendant had already confessed. The Court was divided in that case. As a result, two tests have emerged from *Seibert*; this Court has yet to choose which test should govern. *See United States v. Heron*, 564 F.3d 879, 884-887 (7th Cir. 2009). We need not decide today which test applies, since the facts of this case would not meet the requirements of either test.

Under Justice Kennedy's intent-based test, when an interrogator uses a two-step interrogation strategy, which is predicated upon deliberately withholding *Miranda*

warnings in order to get a confession, post-warning statements that are related to the substance of pre-warning statements must be excluded in the absence of specific, curative steps. *Seibert*, 542 U.S. at 621 (Kennedy, J. concurring). In the present case, there is no evidence that the officers chose to use the alleged two-step proce-dure in order to obtain a confession from Lee.

Under the plurality's test, the question with respect to a two-step interrogation procedure is whether "*Miranda* warnings delivered midstream could be effective enough to accomplish their object." *Id*. at 615. Factors that should be weighed in answering this question include "the completeness and detail of the questions and answers in the first round of interrogation, the over-lapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interroga-tor's questions treated the second round as continuous with the first." *Id*. Here, while the first and second rounds of questions were asked consecutively without a temporal break, there was a clear division between the questions being answered for the personal-history record and the ensuing interrogation. Not only were the questions separated by the reading of *Miranda* rights, but they were different in substance since the personal-history report focused on background questions, while the post-warning interrogation focused on the details of Lee's drug-related charges. While it is conceivable that the officers asked questions that were not specifically listed on the personal-history report, the record does not

support such a finding. Moreover, having been read his *Miranda* rights, Lee signed the *Miranda* waiver, signifying that he understood his rights and had no issues with the previous questions.

Further, the *Seibert* plurality notes that the point of employing a two-step interrogation process "is that with one confession in hand before the warnings the interrogator can count on getting its duplicate, with trifling additional trouble." *Id*. at 613. Here, the personal-history report shows that the officers obtained only preliminary background information on Lee. No confessions were reported until after Lee's *Miranda* rights had been read. Although Lee argues that he felt as if the cat had already been let out of the bag, absent evidence that Lee made a confession before his rights were read to him, this argument bears little weight. Additionally, while the lack of responses on the second page of the personal-history report is troublesome, the absence of any evidence showing that Lee answered *incriminating* questions before his *Miranda* rights were read is highly persuasive.

## CONCLUSION

Lee objects to the district court's decision to deny his motion to suppress his incriminating statements. He contends that those statements were made in violation of his constitutional rights, and, further, that failure to suppress them was not harmless beyond a reasonable

doubt. As stated above, we do not find merit in these contentions. The judgment of the district court is therefore

AFFIRMED.