In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2178

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

THOMAS L. SWANSON,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 3:09-CR-50026—**Frederick J. Kapala**, *Judge*.

ARGUED JANUARY 7, 2011—DECIDED MARCH 24, 2011

Before MANION and WILLIAMS, *Circuit Judges*, and
CLEVERT, *District Judge*.[*]

WILLIAMS, *Circuit Judge*.  In 2009, an arrest warrant was
issued for Thomas Swanson. It was based on his 2008
possession of a firearm without a valid Firearm Owner's

[*] The Honorable Charles N. Clevert, Jr., Chief Judge of the
United States District Court for the Eastern District of Wis-
consin, sitting by designation.

Identification card, which is a violation of Illinois state law. At the time of his arrest, the police presented Swanson with a state court order to turn over all guns in his possession to them as a condition of bond. A police officer also asked him three times to comply with the turn-over order. The arresting officers did not give Swanson notice of his federal constitutional right not to incriminate himself. Approximately forty-five minutes after Swanson's arrest, while he was being held in custody in an interrogation room of a police station, he said that he wanted to comply with the court turn-over order, and admitted that he had a gun hidden under the back seat of his car. As an officer retrieved the gun, another officer gave Swanson his *Miranda* warnings. Swanson then submitted to a written question-and-answer interview where he again admitted possession of a gun.

Swanson was eventually charged with the federal crime of possession of an unregistered firearm. He moved to have the gun and any statements he made about the gun suppressed, arguing that the police obtained the evidence in violation of his Fifth Amendment right against self-incrimination. The district court denied Swanson's motion to suppress, finding that his statements about the gun were spontaneous and voluntary. We disagree. Swanson's initial statement was the result of an unwarned custodial interrogation, which excuses his failure to invoke his constitutional protection against self-incrimination. And his second *Mirandized* written statement was tainted by the unconstitutional manner in which the first statement was obtained. The district

court's denial of Swanson's motion to suppress is reversed, and the case is remanded for further proceedings consistent with this opinion.

## I. BACKGROUND

In June 2009, Thomas Swanson was charged in a one-count indictment with knowingly possessing a sawed-off shotgun that was not registered to him in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. § 5861(d). Swanson filed a motion to suppress the shotgun and any statements he made about the weapon. The district court granted Swanson a hearing and ultimately denied the motion, finding, among other things, that the statements surrounding the gun were "spontaneously volunteered" and admissible into evidence. On February 5, 2010, Swanson entered into a conditional guilty plea agreement that allowed him to appeal the district court's denial of his motion to suppress.

The events giving rise to the 2010 guilty plea began approximately two years earlier, in April 2008. Sergeant David Ford of the Hinckley, Illinois Police Department received information from a confidential informant that Swanson was planning to rob a bank. Sergeant Ford and an agent from the Federal Bureau of Investigation went to Swanson's home in Sandwich, Illinois to interview him. During the interview Swanson said that his family was having financial difficulties and that he had obtained a pistol and had written a bank robbery note. He said he never actually intended to rob a bank,

though, because every time he would think of going through with it he would think of his kids and cry. He also said that he was "off [of his] medications." He told Sergeant Ford that the pistol he obtained for the robbery was in his car, and he gave him permission to search for it. Sergeant Ford searched the car and found the pistol and bank robbery note.

At some point during the interview Sergeant Ford asked Swanson to produce his state issued Firearm Owner's Identification (FOID) card, which is required for an Illinois resident to legally possess or purchase a firearm. Swanson showed Sergeant Ford his FOID card, and Sergeant Ford noticed that the card had expired. He confiscated Swanson's pistol and contacted the DeKalb County State's Attorney's Office to seek criminal prosecution against Swanson for possession of a firearm without a valid FOID card. The office declined to prosecute.

Approximately one year later, in April or May of 2009, Sergeant Ford learned from the same confidential informant that Swanson had resumed his plans to rob a bank. Sergeant Ford contacted the State's Attorney's Office again, and this time charges against Swanson were authorized. Sergeant Ford prepared a criminal complaint for the April 2008 violation of 430 ILCS 65/2(a)(1), which prohibits possession of a firearm without a valid FOID card. Sergeant Ford also prepared an arrest warrant for Swanson for unlawful possession of a firearm. Although the arrest warrant was based on the April 2008 violation, the warrant itself did not state a date of offense.

On May 27, 2009, Sergeant Ford went to a DeKalb County judge to present the complaint and arrest warrant. He was accompanied by an assistant state's attorney. Sergeant Ford did not have any reason to believe that Swanson had firearms in his possession at the time he went to obtain the arrest warrant. The judge, Sergeant Ford, and the assistant state's attorney were the only three persons present when the complaint and arrest warrant were presented. The ex parte hearing occurred in the judge's chambers, and no recording or transcript was prepared. During the hearing, which lasted approximately five to seven minutes, Sergeant Ford detailed the investigation into Swanson's planning of bank robberies. He explained that the criminal complaint was based on an offense that occurred in April 2008, but that he had recently received information that Swanson was in the process of planning to rob a bank again. He also explained that he had checked with the state police and they had not yet issued a new FOID card for Swanson. The judge asked why the government was not pursuing a charge of attempted bank robbery, and the state's attorney responded that there had been no specific attempt on any bank. The judge signed the arrest warrant charging Swanson with unlawful possession of a firearm.[1]

---

[1] Because there is no transcript of the hearing in the state judge's chambers, these facts come from Sergeant Ford's testimony at the district court's hearing on Swanson's motion to suppress.

After the judge signed the arrest warrant, the assistant state's attorney recommended that Swanson be required to turn over all firearms as a condition of bond. He drafted a handwritten order that said, "As further condition of bond, Defendant, Thomas Swanson is directed to turn over any firearms in his possession + control to the Hinckley or Sandwich police department." The judge signed the order.

Armed with the arrest warrant and the turn-over order that had been signed by the judge, Sergeant Ford went to Swanson's home on May 28, 2009. He was joined by a police officer from Sandwich. When they arrived at the house at 10:01 a.m., they found Swanson outside on the front lawn with his four-year-old son. They asked to speak with Swanson and after Swanson's son went inside, they presented him with the arrest warrant and told him that he was under arrest for unlawful possession of a firearm. Sergeant Ford also presented the turn-over order and explained that the judge had issued a court order as a condition of bond that required Swanson to turn over all firearms. He then asked Swanson if he had any firearms in his possession "that he wanted to turn over in compliance with the court order." Swanson said that he had two shotgun cases in the house under his bed and gave Sergeant Ford permission to enter the house and retrieve them. One case contained a shotgun and the other contained only a barrel.

After retrieving the shotgun cases Sergeant Ford went back outside, and again encouraged Swanson to comply

with the court's turn-over order. As Sergeant Ford later testified, he said "Again, I said—I explained that I didn't want him to be in violation of the court order, that I wanted to make sure that he was in compliance, asked him if there were any other guns or even look-alike guns that he wanted us to secure." Swanson replied that there was a look-alike BB gun in his car, retrieved it from the center console, and gave it to Sergeant Ford. When Swanson asked Sergeant Ford to explain his arrest, Sergeant Ford said he would explain later when they sat down and talked. Sergeant Ford then urged Swanson to comply with the turn-over order a third time by "ask[ing] him one more time, just to be sure, to give him a moment to think." Swanson replied that he did not have any other weapons. Swanson remained calm and cooperative throughout the time at his house.

An officer placed Swanson in the back seat of a police car and drove him to the Sandwich Police Department. Swanson was not given *Miranda* warnings when he was presented with the arrest warrant and turn-over order, while he was at his house, before he was placed in the police car, while he was being driven to the police station, or when he arrived at the police station.

Sergeant Ford stayed at Swanson's house while Swanson was taken to the police station. He interviewed Swanson's wife, searched his car, and did not find any weapons. When he finished his search he went to the Sandwich Police Department where Swanson had been taken.

At approximately 10:45 a.m. Sergeant Ford went to the interrogation room where Swanson was being held. As

soon as Sergeant Ford walked in the room, "Mr. Swanson immediately informed me that he wanted to be honest with me, that he wanted to comply with the court order, and that there was one more shotgun underneath the rear seat" of his car. Sergeant Ford asked Swanson for consent to search the car again, and he consented. Sergeant Ford sent another officer back to Swanson's home to retrieve the weapon. After the other officer left the police station, Sergeant Ford gave Swanson notice of his constitutional rights for the first time by reading off of a *Miranda* rights card. Sergeant Ford always carried the card with him, and ordinarily used it when advising arrestees of their rights. He read each right individually and after each one asked Swanson if he understood what he was reading to him. Swanson acknowledged each right after it was read, and said that he understood what he was told. He then agreed to speak with Sergeant Ford.

During the interview Swanson said that he had been staking out a bank and had parked across the street from it on three separate occasions. He also said that he had once staked out another bank. Swanson stayed calm and cooperative throughout the interview. At some point during or after the interview, Sergeant Ford stepped out into the hallway and spoke with the officer who had been sent back to Swanson's house. The officer showed Sergeant Ford a sawed-off shotgun that he found underneath the back seat of Swanson's car. Sergeant Ford went back into the interrogation room and asked Swanson if he would be willing to provide a written statement, and Swanson said that he would.

Sergeant Ford drove Swanson from the Sandwich Police Department to the Hinckley Police Department where they arrived at approximately 12:40 p.m. Sergeant Ford brought Swanson lunch and then conducted a written interview. Sergeant Ford wrote a question, and Swanson wrote the answer. During this written interview Swanson gave more details regarding his bank surveillance, such as where he parked when he watched the banks. He also wrote that he had the sawed-off shotgun in his car "for home defense & to protect me in my car because there was a white van going down my street at different times and also maybe following me in my car." And he wrote that he was supposed to take medication for depression, anxiety, and bi-polar disorder but that he had been off of his medication for approximately two months. After Swanson completed and signed the written interview, he was booked and transported to the DeKalb County Jail.

Swanson was eventually charged with the federal crime of possession of an unregistered firearm, which is a felony offense. The charge was based only on the sawed-off shotgun that the officers found under the back seat of Swanson's car after he told them its location. Swanson moved to have the gun and any statements he made about it suppressed from evidence, arguing, among other things, that the statements were obtained in violation of his Fifth Amendment right against self-incrimination. The district court denied Swanson's motion to suppress because it found that the statements about the gun were spontaneous and voluntary. Swanson entered a conditional guilty plea to the possession

charge which allowed him to appeal the court's denial. Through the presentence investigation report the court learned that Swanson was 41 years old, was a truck driver by trade and a volunteer fireman, and had no criminal history. He was supposed to take medication for anxiety, depression, and bi-polar disorder, but stopped taking it approximately two months before his arrest because he could not afford the medication. The report calculated an advisory Sentencing Guidelines range of 18-24 months' imprisonment and the court sentenced Swanson to nine months' imprisonment and three years of supervised release.

Swanson timely appealed the district court's denial of his motion to suppress. At issue before us is whether the gun and any statements Swanson made about the gun were obtained in violation of his Fifth Amendment constitutional rights, and whether his motion to suppress the evidence should have been granted as a result.

## II. ANALYSIS

Before his plea agreement Swanson moved to have the shotgun found in his car and any statements he made about the gun excluded from evidence but his motion was denied. In reviewing the district court's denial of Swanson's motion we review the court's factual findings for clear error and questions of law de novo. *United States v. Thompson*, 496 F.3d 807, 809 (7th Cir. 2007). We conclude that the district court should have granted Swanson's motion to suppress because Swanson's statements regarding the gun were made as

a result of an unwarned custodial interrogation in violation of his Fifth Amendment right against self-incrimination.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "It has long been held that this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). *See also Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1027 n.15 (7th Cir. 2006). The protection that the Fifth Amendment provides "reflects a judgment that the prosecution should not be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused." *Doe v. United States*, 487 U.S. 201, 212 (1988) (citation and internal punctuation omitted).

The constitutional right against self-incrimination is not a self-executing right. *McKune v. Lile*, 536 U.S. 24, 65 n.10 (2002); *United States v. Arrington*, 73 F.3d 144, 149 (7th Cir. 1996). An individual seeking to invoke the protections of the Fifth Amendment "must assert the privilege rather than answer if he desires not to incriminate himself"; otherwise, a decision to answer is considered voluntary. *Murphy*, 465 U.S. at 429. However, there are exceptions to the general rule that the protections of the

Fifth Amendment must be invoked in order to provide protection. Where "some identifiable factor was held to deny the individual a free choice to admit, to deny, or to refuse to answer", a failure to invoke the Fifth Amendment can be excused. *Id*. (citations omitted). Two of these recognized exceptions are statements made during unwarned custodial interrogation and situations where exercising the right would result in a penalty. *Id*. at 429, 434. Swanson concedes that he did not invoke the Fifth Amendment, but argues that both of these recognized exceptions excuse his failure to invoke the protection.

Swanson first argues that his failure to exercise his Fifth Amendment privilege should be excused because his statements regarding his sawed-off shotgun were the product of unwarned custodial interrogation. He contends that he did not receive notice of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966) before he made incriminating statements and that he was subjected to custodial interrogation. The district court rejected this argument by finding that Swanson's statements were not the product of police interrogation, but rather were "spontaneously volunteered." We disagree.

We note first that voluntary incriminating statements are not subject to *Miranda* warnings and are admissible as evidence. *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007); *Andersen v. Thieret*, 903 F.2d 526, 531 (7th Cir. 1990). This principle also applies to physical evidence that is recovered based on a defendant's voluntary statements. *United States v. Patane*, 542 U.S. 630, 643-44 (2004). We also note that "not all statements obtained by the

police after a person has been taken into custody are considered the product of interrogation." *Hendrix*, 509 F.3d at 374. In *Rhode Island v. Innis* the Supreme Court explained that "interrogation" refers to "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." 446 U.S. 291, 301 (1980). The test we employ in our application of *Innis* is "whether a reasonable objective observer" would have believed that the law enforcement officer's statements to the defendant were "reasonably likely to elicit an incriminating response." *United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002) (citation omitted).

We now turn to this case. When the officers arrested Swanson they presented an arrest warrant stating that he was charged with unlawful possession of a firearm. They simultaneously gave him a court order that directed him to turn over any firearms to the police. Sergeant Ford asked him if he had any firearms "that he wanted to turn over in compliance with the court order." Later, Sergeant Ford directed him a second time to reveal whether he had any guns in his possession: "Again, I said—I explained that I didn't want him to be in violation of the court order, that I wanted to make sure that he was in compliance, asked him if there were any other guns or even look-alike guns that he wanted us to secure." The third time Sergeant Ford urged Swanson to comply with the order he "asked him one more time, just to be sure, to give him a moment to think." Under these circumstances, we find that "a reason-

able objective observer" would believe that Sergeant Ford's statements to Swanson were, at least, "reasonably likely" to elicit the incriminating response from Swanson that he possessed firearms. *See Abdulla*, 294 F.3d at 834. Swanson was therefore under interrogation. Even though Swanson did not disclose the sawed-off shotgun while he was at his house, Sergeant Ford testified that upon his walking into the interrogation room "Mr. Swanson immediately informed me that he wanted to . . . comply with the court order." This disclosure to Sergeant Ford came at most forty-five minutes after Swanson was initially presented with the court order and shortly after Sergeant Ford asked him three times to comply with the court order. The compulsory nature of the court order combined with Sergeant Ford's interrogation created a cloud of coercion that was raised at Swanson's home and carried to the police station, ultimately leading Swanson to "immediately . . . comply with the court order" and incriminate himself as soon as he was again brought together with his interrogator.

Further, this interrogation came while Swanson was in custody and without any notice of his constitutional right against self-incrimination. It is not contested that the officers did not give Swanson his *Miranda* warnings until after they had already presented him with the arrest warrant, placed him in a police car, transported him to a police station, and delivered him to an interrogation room. And the failure to warn came in spite of Sergeant Ford having a *Miranda* rights card on him when he presented Swanson with the arrest warrant and turn-over order, and was contrary to Sergeant Ford's

customary practice of using the card to advise arrestees of their constitutional rights. Also, when Swanson asked Sergeant Ford to explain his arrest, Sergeant Ford did not provide Swanson with notice of his constitutional rights at that time. Instead, he simply said that he would explain later when they sat down and talked.

"Later" came after Swanson granted Sergeant Ford permission to search his car, but we cannot say that this consent was voluntary. In determining the voluntariness of a consent to search, we consider the "totality of the circumstances, including such factors as (1) the person's age, intelligence, and education, (2) whether she was advised of her constitutional rights, (3) how long she was detained before she gave her consent, (4) whether her consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, (6) whether the individual was in police custody when she gave her consent." *United States v. Alexander*, 573 F.3d 465, 477 (7th Cir. 2009) (internal punctuation omitted). On the day Swanson was taken into custody in May 2009, he was presented with a court-issued arrest warrant that said he was charged with unlawful possession of a firearm. The arrest warrant was based on Swanson's April 2008 possession, but there was no date of offense listed on the warrant. Officers presented the warrant in conjunction with a court-issued order that directed Swanson to give

any guns in his possession to the police.[2] Swanson is not a lawyer and had never been arrested before. When he requested explanation of his arrest Sergeant Ford refused to provide it. Swanson had been treated for mental illness in the recent past but had been off of his medication for approximately two months. He may have been showing signs of active mental instability at the time of the written interrogation at the Hinckley Police Department because when he was asked why he had a shotgun in his car, he replied it was because of "a white van going down my street at different times and also maybe following me in my car."

In short, Swanson had no formal legal training or criminal arrest experience, had not been advised of his constitutional rights, was refused information when he asked for explanation of his arrest, was presented with

---

[2] At the district court Swanson argued that the turn-over order was illegal under Illinois state law. He also argued that the order was tantamount to a search warrant issued without probable cause in violation of his Fourth Amendment right against unreasonable search and seizure. The government countered that the order was legal under state law and that the order did not constitute a search warrant. The district court declined to rule on the legality of the turn-over order and found that there was no Fourth Amendment violation because the shotgun was lawfully seized pursuant to a voluntary consent to search. It did not address whether the turn-over order was effectively a search warrant issued without probable cause. Swanson does not raise either of these two issues on appeal and we decline to decide them here.

an arrest warrant stating he unlawfully possessed firearms, was simultaneously shown a court order to turn over all firearms, was repeatedly directed to comply with the court order by a police officer, and had been treated for mental illness but was at that time unmedicated. Under these circumstances we cannot say that Swanson's statements at the Sandwich Police Department were voluntary. *Cf. Arizona v. Mauro*, 481 U.S. 520, 529 (1987) (statements were volunteered where they were not the result of "compelling influences, psychological ploys, or direct questioning.") At oral argument the government noted that Sergeant Ford was cordial to Swanson throughout their interaction. This is true; Sergeant Ford waited until Swanson's son went inside the house before he presented the arrest warrant and he offered Swanson lunch at the Hinckley Police Department. But these facts do not compel a finding that Swanson's statements were voluntary. Violent force and abusive behavior are not prerequisites to infringing upon an individual's rights. Constitutional violations can occur even when they are cloaked in kindness. *See United States v. Reed*, 349 F.3d 457, 465 (7th Cir. 2003) ("misconduct is not limited to situations where the police act in an outright threatening or coercive manner.").

The government contends that even if Swanson's initial statements admitting possession of the shotgun were the result of unwarned custodial interrogation, the gun is still admissible because of the written statement that Swanson provided after he was *Mirandized*. Although this argument has some merit, we ultimately

conclude that the post-*Miranda* statement does not render the evidence admissible. In raising its argument the government notes the Supreme Court's decision in *Oregon v. Elstad*, which held that a "subsequent administration of *Miranda* warnings to a suspect who has given a *voluntary* but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." 470 U.S. 298, 314 (1985) (emphasis added). However, we have found that Swanson's initial statements were not voluntary. So in deciding whether Swanson's *Mirandized* second written statement is insulated from the taint of the first statements we consider whether there has been a sufficient "break in the stream of events" such as "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *Id.* at 310, 314. *See also United States v. Stewart*, 388 F.3d 1079, 1089 (7th Cir. 2004) (quoting *Missouri v. Seibert*, 542 U.S. 600, 618 (2004) (Breyer, J., concurring) ("truly 'effective' *Miranda* warnings . . . will occur only when certain circumstances—a lapse in time, a change in location or interrogating officer, or a shift in the focus of the questioning—intervene between the unwarned questioning and any postwarning statement.")); *Watson v. DeTella*, 122 F.3d 450, 454-55 (7th Cir. 1997) (collecting cases).

Here, there was a time lapse of approximately two hours between Swanson's initial incriminating oral statements and his post-*Miranda* written statement. Although there was a change in place of interrogations because

Swanson was taken from the Sandwich Police Department to the Hinckley Police Department, his interrogator, Sergeant Ford, remained the same. Examining these factors in the aggregate as we must do, *Watson*, 122 F.3d at 454, we conclude that the elapsed time was insufficient to remove the taint from the first improperly obtained confession where the scene of interrogation was moved from one police station interrogation room to another and the interrogator, Sergeant Ford, remained constant throughout. Our decision takes into account the fact that Sergeant Ford's interaction with Swanson began a year before his arrest and that Swanson evinced a particular responsiveness to Sergeant Ford because he "immediately" disclosed the location of his shotgun to him upon their being reunited at the Sandwich Police Department.

Because we conclude that Swanson's statements were the result of unwarned custodial interrogation, we will not decide whether his failure to invoke his Fifth Amendment right should be excused because invoking the right would have subjected him to a penalty.

## III. CONCLUSION

The district court's denial of Swanson's motion to suppress is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

MANION, *Circuit Judge*, concurring. It started as a simple arrest warrant. But at the last moment, the prosecutor suggested the judge add some language. So, on the bottom of the warrant, the judge scribbled

> [a]s further condition of bond, Defendant, Thomas Swanson is directed to turn over any firearms in his possession + control to the Hinckley or Sandwich police department.

This turned the arrest warrant into something more—it is unclear what. It maintained the essential character of an arrest warrant, but with that additional language it had the added effect of being a mutated subpoena duces tecum, conditioning Swanson's right to bond on the production of incriminating evidence. While it is unclear if this complies with Illinois law, it is clear that this order created a penalty situation where, by exercising his Fifth Amendment rights, Swanson would be punished by being denied bail. For that reason, I would suppress the gun and Swanson's confession.

The Fifth Amendment provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself." This protects a person from being called to testify against himself at his own trial and permits him to refuse to "answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). If a person wants to exercise this right, he must assert it. Swanson did not, and normally this would keep him from claiming the

protection. But that failure is excused when a person would have been punished if he exercised his rights. This is commonly called the "penalty exception." *Minnesota v. Murphy*, 465 U.S. 420, 439 (1984). When this occurs, the defendant's failure to assert the privilege is excused, his answers are deemed compelled, and they are inadmissible in a criminal prosecution. *Id.* at 435. In most penalty-exception cases, a person is forced to testify with the threat of some sort of economic sanction.[3]

The seminal case on this issue is *Murphy*, despite the fact that in that case the Supreme Court found that the penalty exception did not apply. In *Murphy*, the defendant had to participate in sex offender treatment and be truthful with his probation officer "in all matters." During one treatment he admitted to a rape and murder he had committed years earlier. This was reported to the probation officer, who met with Murphy and reminded him about the conditions of his proba-

---

[3] *See Lefkowitz v. Cunningham*, 431 U.S. 801, 804-05 (1977); *see also Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280, 283-84 (1968) (finding Fifth Amendment violation when city employees were discharged for invoking Fifth Amendment privilege against self-incrimination); *Gardner v. Broderick*, 392 U.S. 273, 279 (1968) (finding Fifth Amendment violation when police officer was threatened with and subsequently discharged from employment if he did not waive his Fifth Amendment immunity in conjunction with a grand jury investigation); *Garrity v. New Jersey*, 385 U.S. 493, 497 (1967) (finding Fifth Amendment violation when police officers gave coerced confessions under threat of discharge).

tion. Murphy then confessed and he was later charged with murder. The Supreme Court held that the requirement to be "truthful in all matters" with the probation officer was no different than a subpoena before a grand jury that the defendant always tell the truth. In the grand jury context, it is well established that while a defendant must always be truthful, he can always invoke his Fifth Amendment rights. Thus, the Supreme Court held that it was unreasonable for Murphy to fear that he would be penalized for taking the Fifth when talking with his probation officer. *See also United States v. Cranley*, 350 F.3d 617, 622 (7th Cir. 2003) (finding no penalty exception under near identical facts as *Murphy*). In this context, "a fear is unreasonable when it flies in the face of settled law." *United States v. Ollie*, 442 F.3d 1135, 1139 (8th Cir. 2006). Thus, we look to the bond order to determine if it would cause Swanson to fear that he would be punished for exercising his rights, and we look at our precedent to determine whether that fear is reasonable.

Here, the bond order was unusual—to say the very least. A hasty suggestion by the prosecutor, it was scrawled at the bottom of the arrest warrant and conditioned Swanson's bond on him turning over his firearms. Swanson probably assumed that Sgt. Ford knew about the other firearms. After all, Sgt. Ford knew that Swanson was planning a bank robbery, and although some banks are robbed without a gun, normally one is used. And the gun that Swanson was charged with having was confiscated by Sgt. Ford a year earlier, so Sgt. Ford was obviously not looking for that one. For

his part, Sgt. Ford used the order as an effective tool: as the court emphasizes, at three different points during the arrest, he reminded Swanson of his need to comply with the bond order. The order's coercive power was also not lost on Swanson: before "spontaneously uttering" where the shotgun was, Swanson prefaced his statement with the fact that "he wanted to fully comply with the court's order." Clearly Swanson wanted to comply with the order because he wanted to be released on bond, and he felt that if he didn't comply he wouldn't be released on bond. It bears noting that the crime Swanson was arrested for was a misdemeanor, and under Illinois law he had a right to receive bond. 430 ILCS 65/14(a) (first FOID violation constitutes a misdemeanor); ILCS Const. Art. 1, § 9; 725 ILCS 5/110-4 (right to bond). Had Swanson produced any other firearms, they would have been evidence of a felony. 430 ILCS 65/14(b) (second FOID violation constitutes a felony).

In most penalty cases, the threat is explicit. The person is told: If you invoke the Fifth, you will be punished. The Supreme Court has counseled, however, that a threat does not have to be explicit, it can be veiled: If "the state, *either expressly or by implication*, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation." *Murphy*, 465 U.S. at 435 (emphasis added); *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005) (finding the order created a penalty situation "*although the invocation of the Fifth Amendment is not explicitly prohibited*." (emphasis added)). Here, the order did not state that if Swanson invoked the Fifth, he would not get bond. Such

an explicit statement probably would not have been found scribbled at the bottom of such an order, nor is one necessary. Rather, the order here took the form of, "if you want bond, you must produce incriminating evidence."

An honest reading of the order suggests that failure to comply would have resulted in no bond, regardless of whether Swanson invoked his Fifth Amendment rights. He had to turn over all his firearms—that's all the order concerned and that's all that Sgt. Ford cared about. Thus, it was objectively understandable for Swanson to anticipate that by taking the Fifth, Sgt. Ford would assume Swanson was not complying with the order and bond would have been denied.[4] On this point, it is very telling that Ford repeated the command three times, including after Swanson turned over the initial firearms. In addition, after being alone in the holding cell for forty-five minutes Swanson prefaced his confession that he had another gun in the car with the fact that "he wanted to fully comply with the court's order."

---

[4] It is unclear from the bond order or the briefs who would make the determination of whether Swanson had complied. Naturally, it makes sense that a magistrate or judge would make that determination but such a finding would rely heavily on Sgt. Ford's investigation and statement on the issue. Indeed, the government concedes in its brief that had Swanson said nothing more, Sgt. Ford would have assumed he fully complied and Swanson could have posted bond. So, Sgt. Ford's impression was critical to Swanson receiving bond.

Thus, the order can fairly be read as a threat to Swanson that if he invoked his Fifth Amendment rights he would not receive bond.

The issue then turns on whether Swanson's fear was reasonable under our precedent. *Cranley*, 350 F.3d at 622. Again, this is an unusual order. It is primarily an arrest warrant but with the bond's condition scribbled at the bottom, it has aspects of a subpoena duces tecum and a search warrant. The stated purpose of the order is that there is probable cause to arrest Swanson and it spells out the conditions for him to post bond. The effect of the flawed order, however, is that Swanson must produce this incriminating evidence, evidence that is normally not turned over by a suspect but gathered by the police when they have probable cause and are armed with a search warrant. Sgt. Ford knew that Swanson did not have a valid firearm registration. So any additional firearms he turned over would be evidence of other crimes, this time a felony offense. In this way, the act of producing the firearms constituted testimonial self-incrimination. *See United States v. Doe*, 465 U.S. 605, 612-13 (1984). By complying with the turn-over order, Swanson would concede the existence, and his control, of the firearms. *See United States v. Hubbell*, 530 U.S. 27, 36-37 (2000). And such a testimonial act would, of course, be protected under the Fifth Amendment, if Swanson had asserted his right. *Id.*

The very unusual order has features of a subpoena duces tecum, but certainly doesn't qualify for that process. *See* Fed. R. Crim. P. 17. Yet the testimonial act of

producing the firearms is somewhat analogous to the requirement of a subpoena. While Swanson could invoke his Fifth Amendment rights against a subpoena duces tecum, the contours of that right are confusing and not always clear. *See Fisher v. United States,* 425 U.S. 391, 409-10 (1976); *Hubbell,* 530 U.S. at 36-38 (surveying the intricacies that attach to claiming the Fifth Amendment privilege when responding to subpoenas); *Baltimore City Dep't of Social Services v. Bouknight,* 493 U.S. 549, 554-56 (1990) (same). The intricacies of who may assert the privilege, when it may be asserted, and what constitutes a testimonial act is probably completely lost on the public. It is certainly not as clear as the right Swanson enjoys to invoke the Fifth and refuse to answer questions examined in *Murphy* and *Cranley.* The right to remain silent and to plead the Fifth at trial or before the grand jury is well known throughout our case law and culture. *See Dickerson v. United States,* 530 U.S. 428, 443 (2000) ("*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture."). The situation Swanson faced was distinct from the issues examined in *Murphy* and *Cranley.* Indeed, no document similar to this combined arrest warrant and conditional bond order has any legal precedent that I can find, and the government has cited to none. It is unfortunately unique and should not be repeated. In short, nothing in our precedent would make it unreasonable for Swanson to fear that he would be denied bond if he exercised his Fifth Amendment rights instead of admitting the location of the other firearms.

Swanson was placed in a troubling position. Although he was not exposed to what the Supreme Court calls "the cruel trilemma of self-accusation, perjury or contempt," *Michigan v. Tucker*, 417 U.S. 433, 444-45 (1974), he was forced to choose between self-incrimination, a potential obstruction of justice charge since he was not under oath at the time, or being denied bond for a misdemeanor offense. In other words, he was forced to either sacrifice his Fifth Amendment rights or forego bond and wait in jail for the matter to be sorted out, which could take some time. The fact that he faced such a threat and ceded to it means his statements were compelled and should have been suppressed. For that reason I believe this falls within the penalty exception.

Thus, I respectfully concur with the court's decision that the firearm and Swanson's statements should have been suppressed.