# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-2690

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RONALD L. JOHNSON, also known as
JOSHUA MCGHEE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10-CR-121—**Rudolph T. Randa**, *Judge.*

ARGUED JANUARY 9, 2012—DECIDED MAY 24, 2012

Before FLAUM and KANNE, *Circuit Judges*, and CHANG, *District Judge*.[*]

KANNE, *Circuit Judge*. Ronald L. Johnson was convicted of possession with intent to distribute 50 grams or more of crack cocaine and possession of a firearm by

[*] The Honorable Edmond E. Chang, United States District Court for the Northern District of Illinois, sitting by designation.

a convicted felon. He was sentenced to 300 months' imprisonment. On appeal, Johnson challenges his conviction and sentence on several grounds, arguing that (1) his motion to suppress was improperly denied; (2) the trial judge should have recused himself *sua sponte*; (3) an aiding and abetting instruction was given in error; (4) the obstruction of justice enhancement should not apply; and (5) the sentencing judge improperly determined that Johnson is a career offender. After considering all of these arguments, we affirm Johnson's conviction and sentence.

## I. BACKGROUND

Sometime in late 2008, an informant told Milwaukee police officers that a man known as "Loc" was dealing large amounts of cocaine out of his residence on West Vliet Street, part of the Hillside Terrace Housing Project in Milwaukee. Loc and his girlfriend, Nina Fenske, resided in Unit 301, although only Fenske's name was on the lease. The informant also told officers that Loc had a gun and prior criminal history. Armed with this information, Milwaukee police officers conducted surveillance of Unit 301 for approximately two months. During this time, they observed only Fenske and a man later identified as Johnson coming and going from the residence.

On the morning of January 29, 2009, police officers arranged to execute a search warrant at the West Vliet address. Officers Todd Bohlen and James Henry set up surveillance in an unmarked police car. They observed Johnson exit the residence and drive away in a silver

Chevy Impala. Officers Bohlen and Henry followed Johnson for approximately four blocks before pulling him over, even though Johnson did not commit a traffic violation. Officer Bohlen testified at the suppression hearing that the purpose of this stop was to ensure the preservation of evidence and safety of the officers while they executed the search warrant.

Officer Bohlen approached Johnson's vehicle and requested his driver's license. In response, Johnson handed Officer Bohlen a driver's license issued in the name of Joshua McGhee.[1] Officer Bohlen then inquired if Johnson had any aliases, to which Johnson replied, "Loc, Ron Loc." Upon request, Johnson also provided his current address on West Vliet Street. After this short exchange, Officer Bohlen asked Johnson to exit the vehicle to conduct a pat-down for safety purposes. During this pat-down, Officer Bohlen asked if Johnson had anything on him and Johnson stated that he had some weed in his shoe. Johnson was then placed in handcuffs and taken to Officer Bohlen's vehicle. While Johnson sat in the back seat, Officer Bohlen removed Johnson's left shoe and discovered a small baggie of marijuana.

At this point, Officer Bohlen informed Johnson of the search warrant for his residence on West Vliet Street. Johnson remained in the back of Officer Bohlen's vehicle while Officer Bohlen called for assistance and a police wagon. Approximately thirty to forty minutes after the initial traffic stop, Johnson was transported to his

---

[1] Joshua McGhee was later identified as Johnson's brother.

residence in the police wagon, where he remained in handcuffs while officers searched his apartment.

As Johnson waited in the police wagon, Officer Bohlen read a copy of the search warrant to him. Johnson and Officer Bohlen disagree on the ensuing dialogue. Officer Bohlen testified that immediately after he read the search warrant aloud, Johnson confessed that everything in the apartment was his. In contrast, Johnson testified that Officer Bohlen read the warrant and then asked him, "Is there anything that you want to talk to me about, that you want to tell me right now?" (Supp. Tr. at 87.) Johnson responded that he didn't know what Officer Bohlen was talking about, to which Officer Bohlen replied, "Well, you know, if we go in here and find any-thing we cannot only arrest you but we can arrest who's ever [sic] on the lease." *Id.* According to Johnson, it was only after Officer Bohlen made this statement that Johnson confessed that anything found in the apart-ment belonged to him.

Following Johnson's confession, he and Officer Bohlen spoke for a while longer, although Officer Bohlen did not recall the specifics of their conversation. At one point, Officer Bohlen asked Johnson for the combination to a safe discovered in the apartment, but Johnson told Officer Bohlen the safe belonged to his girlfriend. Johnson confessed during the suppression hearing that this was a lie and he later gave the combination to officers at the police station. Officers discovered a firearm and a large amount of cash in the safe.

In the end, police officers recovered crack cocaine, marijuana, ecstasy pills, a scale, a firearm, and $19,940

cash from the apartment. The search lasted approximately one hour, after which Johnson was transported to the Milwaukee police department's administration building for booking. There, Johnson was taken to an interview room. According to Johnson's testimony, Officer Bohlen entered the room first. He asked Johnson if he knew about the items found in the apartment, implied that Johnson's girlfriend would be kicked off of housing assistance, and asked if Johnson wanted his girlfriend's daughter to end up in state custody. Johnson maintains that no one else was present during this questioning. According to the government, Officer Andrew Bell advised Johnson of his *Miranda* rights and interviewed Johnson for approximately forty minutes. Officer Bohlen was present for a majority of the interview but did not enter the room until after Officer Bell began questioning Johnson. During the interview, Johnson admitted that the apartment contained a scale, crack cocaine on a shelf in the bedroom closet, and a safe that held a gun and approximately $20,000. He also discussed his knowledge of drug distribution and estimated that in two years he sold approximately ten to fifteen kilograms of cocaine. He identified his supplier as a man from Chicago named "Simon," and remarked that Simon never brought the cocaine to Johnson's house.

On March 24, 2009, a federal grand jury charged Johnson with possession of cocaine base with intent to distribute, possession of MDMA (Ecstasy) with intent to distribute, and possession of a firearm by a convicted felon. Johnson's case was docketed as 09-CR-83 and assigned to the Honorable J.P. Stadtmueller. Johnson

filed a motion to suppress, which argued that Johnson's statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). This motion was assigned to Magistrate Judge Aaron E. Goodstein. While the motion to suppress was pending, Judge Stadtmueller recused himself from the case, citing 28 U.S.C. § 455(a) and (b)(3). Judge Stadtmueller provided no additional explanation for his recusal. The Honorable Rudolph T. Randa was thereafter assigned to the case.

The magistrate judge held an evidentiary hearing on Johnson's motion to suppress on September 2, 2009. Following this hearing and additional briefing, Magistrate Judge Goodstein recommended that the motion be denied. Judge Randa adopted this recommendation on February 24, 2010, and scheduled Johnson's trial for June 1, 2010. In May, Johnson filed a motion to dismiss, arguing that his trial was not conducted within the time requirements of the Speedy Trial Act, 18 U.S.C. § 3162(a)(2). The government agreed that a speedy trial violation occurred but asked that the case be dismissed without prejudice. Judge Randa dismissed the case without prejudice on June 10, 2010.

On June 22, 2010, a federal grand jury returned another three-count indictment against Johnson based upon the same evidence as Johnson's first case. This second case, docketed as 10-CR-121, was again assigned to Judge Stadtmueller. Johnson was arraigned for a second time and new motions deadlines were set. This time, Johnson filed a motion to suppress based on an alleged *Franks* violation. *See Franks v. Delaware*, 438 U.S. 154, 155-56

(1978) (permitting a defendant to challenge the constitutionality of a search if he can show intentional or reckless misrepresentations in the warrant affidavit). Johnson did not file a *Miranda* motion in the second case and his *Franks* motion was ultimately denied.

Judge Stadtmueller presided over Johnson's two-day jury trial. Johnson testified and claimed that his girlfriend's friend, Jamie, and her boyfriend, Simon, had moved into the residence on West Vliet Street. Johnson felt Simon staying there was a problem because he was selling drugs from that address. Johnson admitted that the gun belonged to him but denied that the drugs were his. He stated that he lied to officers following his arrest because he was concerned that they would arrest his girlfriend instead. After the close of evidence, Judge Stadtmueller instructed the jury and, at the government's request and over Johnson's objection, included an aiding and abetting instruction on the basis of Johnson's testimony that Simon sold drugs out of the West Vliet address. The jury convicted Johnson on two counts: possession with intent to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).[2]

Prior to sentencing, Judge Stadtmueller asked the parties to brief the applicability of the Fair Sentencing Act of 2010 ("FSA") to Johnson's case. On April 8, 2011,

---

[2] Count Two, possession with intent to distribute MDMA, was dismissed prior to trial.

the government sent a letter to Judge Stadtmueller noting that, because the jury found that Johnson was liable for 280 grams or more of crack cocaine, the retroactive application of the FSA was not at issue. In other words, the drug amount found by the jury was enough to trigger a ten-year mandatory minimum sentence, even under the FSA's amendments to 21 U.S.C. § 841. On the same day this letter was received by the district court, Judge Stadtmueller recused himself from the case, again citing 28 U.S.C. § 455(a) and (b)(3). The case was reassigned to Judge Randa.

At sentencing, Judge Randa was tasked with determining an appropriate sentence for Johnson, despite not having presided over the trial. Judge Randa first concluded that Johnson was a career offender based on his prior convictions for aggravated robbery, aggravated discharge of a firearm, and aggravated battery with a firearm. He also applied sentencing enhancements for possession of a firearm and obstruction of justice. Johnson received a sentence of 300 months on Count One and 120 months on Count Three, to run concurrent to each other and to the state court sentences Johnson was also serving. Johnson filed this timely appeal.

## II. ANALYSIS

As noted previously, Johnson challenges several aspects of his conviction and sentence, including (1) the denial of his motion to suppress; (2) Judge Stadtmueller's refusal to recuse himself *sua sponte*; (3) the aiding and abetting instruction given at trial; (4) the application of

the obstruction of justice enhancement; and (5) the finding that Johnson is a career offender. Following oral argument, we issued an opinion addressing whether this court may consider Johnson's suppression argument since he did not renew his motion to suppress in the second case. In that opinion, we held that Johnson's argument was merely forfeited and could be reviewed for plain error. Accordingly, we granted Johnson's motion to expand the record on appeal and permitted Johnson and the government to file supplemental briefs addressing the denial of Johnson's motion to suppress in 09-CR-83. *United States v. Johnson*, 668 F.3d 540, 543 (7th Cir. 2012). We withheld consideration of Johnson's additional challenges until after the record was supplemented and the parties had filed their briefs. *Id.* The parties now having filed their supplemental briefs, this matter is ripe for decision.

*A. Motion to Suppress*

Johnson first challenges the district court's denial of his motion to suppress statements allegedly elicited in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Because this argument was forfeited by Johnson's failure to raise it in his second case, we review the district court's holding for plain error. *Johnson*, 668 F.3d at 542.[3] Applying

---

[3] Johnson argues that we should reconsider our finding of two distinguishable cases (09-CR-83 and 10-CR-121), arguing that his second case should be treated like a superseding indict-

(continued...)

this standard, we reverse only when we find: "(1) an error or defect (2) that is clear or obvious (3) affecting the defendant's substantial rights (4) and seriously impugning the fairness, integrity, or public reputation of judicial proceedings." *United States v. Anderson*, 604 F.3d 997, 1002 (7th Cir. 2010).

The Supreme Court's holding in *Miranda* was designed to safeguard a suspect's Fifth Amendment

---

[3] (...continued) ment. We reject Johnson's analogy, and find support for this position in our sister circuit's precedent:

> [T]here are crucial distinctions between a superseding indictment and a reindictment. Hoslett's separate indictment on the firearm charges constituted an entirely new case. The charges were adjudicated in a separate trial. Hoslett was subjected to a separate detention hearing in the new case. While a superseding indictment requires a rearraignment, it does not create a new case with its own, independent identity. The district court established new and different motion deadlines for the second case. Hoslett filed a separate motion to suppress in that case. . . . In sum, when a superseding indictment is filed there is only one criminal action; a reindictment results in two. The distinction makes all the difference here.

*United States v. Hoslett*, 998 F.2d 648, 658 (9th Cir. 1993). Although *Hoslett* addressed charges dismissed on the motion of the government which were later refiled in a new indictment, we believe the Ninth Circuit's discussion is also relevant to this case. Accordingly, we affirm our prior ruling that the two cases at issue here are two distinct cases.

constitutional guarantee against self-incrimination. *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011). Under *Miranda* and its progeny, "the government may not use statements stemming from the custodial interrogation of a defendant unless the government has utilized procedural safeguards effective to secure the privilege against self-incrimination." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) (*citing Berkemer v. McCarty*, 468 U.S. 420, 428 (1984)). In order for *Miranda*'s safeguards to apply, a suspect must be in "custody" and subject to "interrogation." A suspect is in custody for purposes of *Miranda* if, based on a totality of the circumstances, a reasonable person in the suspect's position would not have believed he was free to leave. *See United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011). To constitute custodial interrogation, a police officer's words or actions must be reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). If a suspect makes an incriminating statement during custodial interrogation, the burden is on the government to show the suspect "voluntarily, knowingly and intelligently" waived his rights. *J.D.B.*, 131 S. Ct. at 2401 (*quoting Miranda*, 384 U.S. at 444).

Johnson gave three statements to police officers: (1) after he was pulled over, Johnson admitted his shoe contained a bag of marijuana; (2) after Officer Bohlen read the search warrant to him, Johnson confessed that everything in the apartment was his; and (3) after he was taken to the police station, Johnson spoke with Officers Bell and Bohlen about the drugs, gun, and money found at the West Vliet residence. We address each of these statements in turn.

*1. Possession of Marijuana*

Johnson gave his first incriminating statement after he was pulled over by Officer Bohlen. Officer Bohlen testified that he detained Johnson for purposes of executing the search warrant, although he did not communicate his intent to Johnson. After approaching Johnson's vehicle, Officer Bohlen requested his driver's license and inquired about his address and aliases. Officer Bohlen then asked Johnson to exit the vehicle. As Officer Bohlen was conducting a pat-down for weapons, he asked Johnson, "Do you have anything on you you shouldn't have?" (Supp. Tr. at 22.) Johnson replied that he had marijuana in his shoe. At this point, Johnson was placed in handcuffs. Officer Bohlen did not read Johnson his *Miranda* rights at any time during this exchange.

In Johnson's first case, the district court cited several reasons for denying Johnson's motion to suppress as to his admission of possessing marijuana. First, the district court found that, prior to Johnson's confession, a reasonable person in Johnson's position would have believed he was detained pursuant to a routine traffic stop. Under *Terry v. Ohio*, 392 U.S. 1 (1968), a person subject to a routine traffic stop is not in custody for *Miranda* purposes. Accordingly, because all relevant questioning occurred prior to Johnson's arrest, he was not in custody and there was no *Miranda* violation. In addition, the district court held that Officer Bohlen's questions did not amount to interrogation. Preliminary questions about a suspect's identity and information to confirm or dispel an officer's suspicions are

permissible prior to any *Miranda* warnings. Finally, the district court believed Officer Bohlen's question about whether Johnson had anything on him fell within the public safety exception to *Miranda*, as articulated in *New York v. Quarles*, 467 U.S. 649 (1984). We agree with the district court's reasoning.

The Supreme Court has held that police officers may conduct an investigatory stop of an individual if they have "specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime." *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990) (*citing United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975); *Terry v. Ohio*, 392 U.S. 1 (1968)). A typical traffic stop is analogous to a *Terry* stop, and during these stops an officer is permitted to ask questions to determine an individual's identity and to obtain information confirming an officer's suspicions. *See Berkemer*, 468 U.S. at 439. Given the nonthreatening nature of this sort of detention, the Supreme Court has held that "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." *Id.* at 440. Accordingly, we have previously determined that *Miranda* warnings are not required during *Terry* investigatory stops. *See United States v. Boden*, 854 F.2d 983, 995 (7th Cir. 1988); *accord United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994) ("While detention during the execution of a search warrant is not a traditional *Terry* stop, it is sufficiently analogous for us to conclude that, in the usual case, *Miranda* warnings are not required." (footnote omitted)).

This is not to say that all investigatory stops are "typical" or that *Miranda* warnings are never required. In this case, Johnson argues that he was subject to more than a *Terry* stop and was, in fact, in custody while Officer Bohlen questioned him. The test for determining whether a suspect is in custody during a *Terry* stop looks to "how a reasonable man in the suspect's position would have understood his situation." *United States v. Wyatt*, 179 F.3d 532, 536 (7th Cir. 1999) (quotation marks and citation omitted). This inquiry is objective and "[n]either the subjective views of the suspect being questioned nor that of the officer engaging in the questioning is considered." *Ambrose*, 668 F.3d at 954. From this perspective, we agree with the district court's conclusion that Johnson would have understood his situation as a routine traffic stop. Nothing in the record indicates that Johnson was aware that officers were conducting surveillance of his residence or that they had obtained a search warrant. Instead, Johnson was pulled over while driving his vehicle and Officer Bohlen requested his driver's license. A reasonable person would view this situation as a typical traffic stop.

Nor was Johnson in custody after he got out of his vehicle, prior to his confession that his shoe contained marijuana. We have previously rejected the argument that a reasonable person subject to a pat-down would not feel free to leave, *see Wyatt*, 179 F.3d at 536, and there is no other evidence to support such a claim. For instance, no weapons were drawn, Johnson was not told he was under arrest, Johnson was not handcuffed, only two plainclothes officers were present, the encounter

occurred on a public roadway, and there was no other display of force or physical restraint.[4] Based on the totality of the circumstances preceding Johnson's confession, a reasonable person in Johnson's position would have felt free to leave and he was not in custody for *Miranda* purposes. Thus, the district court did not plainly err in refusing to suppress Johnson's confession that he had marijuana in his shoe.

## 2. *Ownership of All Items in the Apartment*

Johnson made his second confession after he was placed under arrest and transported to the West Vliet address. At this point in time, it is undisputed that Johnson was in custody and had not been read his

---

[4] In determining whether a reasonable person would have believed he or she was free to leave, we consider such factors as:

> (1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that he was not under arrest and was free to leave; (4) whether the individuals were moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the defendant of documents she needed to continue on her way; and (7) whether the officers' tone of voice was such that their requests would likely be obeyed.

*United States v. Barker*, 467 F.3d 625, 629 (7th Cir. 2006) (*quoting Wyatt*, 179 F.3d at 535).

*Miranda* rights. Thus, the central issue is whether Johnson was subjected to interrogation prior to stating that everything in the apartment was his.

At the suppression hearing, Officer Bohlen and Johnson offered different accounts of their interaction at the West Vliet address. Officer Bohlen testified that he read a copy of the search warrant from top to bottom as Johnson sat in the back of the police wagon. After he read the last line, Johnson stated, "Everything in the apartment's mine, it's all mine." (Supp. Tr. at 28.) Officer Bohlen also testified that he did not question Johnson in any way about the search warrant prior to Johnson's admission. In contrast, Johnson testified that Officer Bohlen read the search warrant aloud and then asked, "Is there anything that you want to talk to me about, that you want to tell me right now?" *Id.* at 87. In addition, Officer Bohlen stated, "If we find anything in the apartment I can arrest not only you but who's ever [sic] on the lease." *Id.* According to Johnson, it was only after this statement from Officer Bohlen that Johnson admitted everything in the apartment belonged to him.

Even if a suspect is in custody, his statements are not necessarily the product of interrogation such that *Miranda*'s requirements are triggered. *See Ambrose*, 668 F.3d at 955 (*quoting United States v. Swanson*, 635 F.3d 995, 1002 (7th Cir. 2011)). For instance, "voluntary in-criminating statements are not subject to *Miranda* warnings and are admissible as evidence." *Swanson*, 635 F.3d at 1001-02; *Ambrose*, 668 F.3d at 955 ("Law enforce-

ment officers are not prohibited from merely listening to a person's voluntary statement."). As noted previously, the test for determining whether a suspect was subjected to interrogation is whether a reasonable objective observer would believe that an officer's express questioning, words, or actions were "reasonably likely to elicit an incriminating response." *Swanson*, 635 F.3d at 1002 (*quoting United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002)). The focus is on the suspect's perceptions rather than the intent of the police. *Innis*, 446 U.S. at 301.

The district court determined that Officer Bohlen's testimony was more credible, given Johnson's "obvious motive to be untruthful." In addition, noting Johnson's willingness to cooperate with authorities and his testimony that he lied to officers about the ownership of the safe in the apartment, the magistrate judge found Johnson's version of the encounter between him and Officer Bohlen to be incredible. Thus, the court held that Johnson's statement was spontaneous and unsolicited.

We give special deference to a district court on matters of witness credibility in light of the district court's "superior vantage point." *United States v. Pillado*, 656 F.3d 754, 770 (7th Cir. 2011) (*quoting United States v. Whited*, 539 F.3d 693, 697 (7th Cir. 2008)). In other words, the district court's decision is entitled to deference because the magistrate judge actually heard the testimony and observed the demeanor of the witnesses in making his credibility determination. *See United States v. McCarthur*, 6 F.3d 1270, 1275 (7th Cir. 1993). In light of

this standard and the record before us, we see no reason to upset the district court's credibility determination.

But our analysis does not end here. Even acknowledging the magistrate judge's credibility finding, Johnson argues that Officer Bohlen's own testimony provides enough evidence to establish that Johnson was subjected to interrogation. Specifically, Johnson asserts that Officer Bohlen's act of reading the search warrant aloud was designed to elicit an incriminating response. Interrogation need not be express questioning; in fact, "[a]n officer can 'interrogate' a suspect for *Miranda* purposes without uttering a question." *United States v. Richardson*, 657 F.3d 521, 525 (7th Cir. 2011) (*citing Innis*, 446 U.S. at 300-01). For instance, in *Rhode Island v. Innis*, a man accused of killing another man with a shotgun was arrested and placed in the back of a police car. 446 U.S. at 294-95. On the way to the police station, the officers transporting the defendant talked about the missing murder weapon, noting that there were several handicapped children in that area who might happen upon the weapon and hurt themselves. *Id.* Apparently concerned for these children, the defendant interrupted the conversation to tell the officers where the shotgun was located. *Id.* at 295. The Supreme Court held that the defendant was not interrogated by police officers because there was nothing to suggest that the officers' conversation was reasonably likely to elicit an incriminating response. *Id.* at 302-03 ("Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have

known that it was reasonably likely that Innis would so respond."). The fact that the defendant may have been subjected to "subtle compulsion" was not enough for the Court to find a *Miranda* violation. *Id.* at 303.

In this case, Officer Bohlen read the search warrant to Johnson as Johnson sat in the police wagon outside the residence. Officer Bohlen testified that he approached Johnson and stated, "Okay, now I'm going to read the warrant to you." (Supp. Tr. at 52.) After he read the warrant aloud, Johnson declared that everything in the apartment was his. In light of these facts, we find that Officer Bohlen's actions do not constitute interrogation for purposes of *Miranda*. This case is analogous to those cases in which we have held that merely reciting the evidence against a suspect is not the functional equivalent of an interrogation. *See, e.g.*, *United States v. Vallar*, 635 F.3d 271, 285 (7th Cir. 2011) ("Merely apprising Vallar of the evidence against him by playing tapes implicating him in the conspiracy did not constitute interrogation."); *Easley v. Frey*, 433 F.3d 969, 974 (7th Cir. 2006) (advising a suspect of witness testimony implicating him in a crime that could subject him to the death penalty was not interrogation); *United States v. Sutton*, 77 F. App'x 892, 895 (7th Cir. 2003) (nonprecedential) (officer's statement to defendant that he found marijuana and a gun on the defendant's property was not an interrogation, and defendant's interjection that the items belonged to him and not his sons was an admissible, volunteered statement). By reading the warrant aloud, Officer Bohlen informed Johnson of the items officers had probable cause to search

for in his apartment, essentially advising Johnson of potentially incriminating evidence that could be used against him. Johnson then made a voluntary statement in response.

Cases from our sister circuits support this holding. *See, e.g.*, *United States v. Genao*, 281 F.3d 305, 310-11 (1st Cir. 2002) (detective's actions did not constitute interrogation where detective showed suspect items seized from his apartment and stated, "we've got a problem here"); *United States v. Payne*, 954 F.2d 199, 202-03 (4th Cir. 1992) (officer's statement to defendant that they found a gun in his house was not interrogation); *Shedelbower v. Estelle*, 885 F.2d 570, 572-73 (9th Cir. 1989) (informing suspect that his accomplice was in custody and the victim had identified the suspect was not the functional equivalent of interrogation). We have previously cited with approval the Fourth Circuit's reasoning in *Payne*, noting that providing such information to a suspect may even be helpful to him because "'information about the evidence against a suspect may also contribute to the intelligent exercise of his judgment regarding what course of conduct to follow.'" *Easley*, 433 F.3d at 974 (*quoting Payne*, 954 F.2d at 202). "Like the Fourth Circuit, we do not believe that the provision of information, even if its weight might move a suspect to speak, amounts to an impermissible 'psychological ploy.'" *Id.*

Here, Officer Bohlen read the search warrant to Johnson, informing him of the items the officers were searching for within his apartment. Like *Innis*, there was nothing to indicate that reading the search

warrant aloud would prompt Johnson to confess to owning everything in the apartment in order to protect his girlfriend. The only indication that Officer Bohlen was trying to play on Johnson's fears that his girlfriend would be in trouble comes from Johnson's own discredited testimony at the suppression hearing. Accordingly, the district court properly denied the motion to suppress Johnson's confession that everything in the apartment belonged to him.

### 3. Johnson's Statements at the Police Station

Johnson's final statement to police officers occurred during his interview at the police station with Officers Bell and Bohlen. During this interview, which was recorded and is part of the record, Officer Bell first introduced himself to Johnson and asked if Johnson needed anything. Johnson's handcuffs were removed and he was provided water and cigarettes. Officer Bell then obtained background information from Johnson concerning his personal history, family, and education. After getting this basic information, Officer Bell read Johnson his *Miranda* rights and Johnson indicated that he understood those rights. Johnson then told the officers what he knew about the items found in the apartment and discussed his drug distribution activities in detail. As noted by Magistrate Judge Goodstein, the entire interview was cordial and no threats were made by either of the officers.

Johnson believes the statements he gave at the police station should be excluded because they were tainted

by Officer Bohlen's prior actions. To support this argument, Johnson attempts to stretch the holding of *Missouri v. Seibert*, 542 U.S. 600 (2004), to this case. In *Seibert*, the Supreme Court was confronted with a practice used by some police forces of failing to provide *Miranda* warnings during custodial interrogation until after the interrogation produced a confession. *Id.* at 604. After a confession was obtained, the interrogating officer would read the suspect his *Miranda* rights and then proceed through a similar line of questioning. *Id.* This "question first, warn later" approach was rejected by the Supreme Court in a plurality opinion which resulted in two potential tests for evaluating such practices.[5]

---

[5] Under the plurality's test, the court determines whether a two-step interrogation procedure's "midstream recitation of warnings after interrogation and unwarned confession" is effective enough to accomplish the purposes of *Miranda*. *Seibert*, 542 U.S. at 604. The court looks to: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615. The second test, from Justice Kennedy's concurrence, looks to an interrogator's intent in using a deliberate two-step interrogation procedure. *Id.* at 622. If this deliberate procedure is used, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* Such

(continued...)

We have yet to determine which test governs in this circuit. *See United States v. Lee*, 618 F.3d 667, 678 (7th Cir. 2010). As in *Lee*, we need not determine which test applies at this juncture because the facts of this case do not meet the requirements of either test. *See id.*

Johnson's case fails to satisfy either *Seibert* test because he has not shown the existence of a prewarning custodial interrogation. Thus, his case differs markedly from *Seibert*. In that case, Seibert was arrested and taken to the police station prior to any questioning. 542 U.S. at 604-05. Seibert was clearly in custody and the officers engaged in interrogation lasting thirty to forty minutes. *See id.* After Seibert confessed, officers gave her a twenty-minute break followed by *Miranda* warnings and a second confession. *Id.* at 605. In contrast, as we have already noted, Officer Bohlen's first contact with Johnson occurred during a traffic stop in which Johnson was not in custody, and thus not subjected to custodial interrogation. In addition, although Johnson was in custody at the time Officer Bohlen read the search warrant aloud, we have already determined that this action did not amount to interrogation. Based on these findings, at no time prior to Johnson's interrogation at the police station were police officers required to read Johnson his *Miranda* warnings. This case is simply not the type of situation *Seibert* intended to address.

---

[5] (...continued)

curative measures may include a substantial break in time and circumstances such that a reasonable person would understand the effect of the *Miranda* waiver. *Id.*

Finding that the district court did not plainly err in denying Johnson's motion to suppress, we now turn to Johnson's remaining arguments on appeal.

## B. *Recusal*

In Johnson's first case (09-CR-83), Judge Stadtmueller recused himself five months into the case, noting that he was required to recuse under 28 U.S.C. § 455(a) and (b)(3). In Johnson's second case (10-CR-121), Judge Stadtmueller presided over the trial, but recused himself prior to sentencing, citing the same statutory authority as the first case. Johnson now argues for the first time on appeal that Judge Stadtmueller's failure to recuse himself *sua sponte* in the second case deprived Johnson of having the same judge preside over both his trial and sentencing, and implicated the public interest in the impartial administration of justice.

Under § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." A judge shall also disqualify himself "[w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy." 28 U.S.C. § 455(b)(3). In this circuit, a § 455(a) claim of bias is not properly preserved for appeal unless a defendant seeks a writ of mandamus. *United States v. Diekemper*, 604 F.3d 345, 351-52 (7th Cir. 2010). This rule upholds the general

principle that a post hoc motion for recusal does little to remedy a § 455(a) violation, as the purpose of § 455(a) is to preserve the appearance of impartiality. *Id.* at 352. Although this case presents somewhat unusual procedural circumstances, the same reasoning applies. Therefore, we apply the same standard. *Accord United States v. Ruzzano*, 247 F.3d 688, 694 (7th Cir. 2001) ("Because a party waives his § 455(a) recusal argument by failing to petition for a writ of mandamus, it follows that he also waives it by failing altogether to raise it at the district court level."). Thus, Johnson's § 455(a) challenge is waived.

" 'It is less clear under our case law whether we may review a refusal to recuse under section 455(b) when the argument is raised for the first time on appeal,' but assuming that we can, that review will be for clear error." *Diekemper*, 604 F.3d at 351 (*quoting United States v. Smith*, 210 F.3d 760, 764 (7th Cir. 2000)). As in *Diekemper*, Johnson did not raise the issue of recusal before the district court but now argues that the judge had a duty to recuse himself *sua sponte*. *See id.* Accordingly, we review Johnson's § 455(b)(3) challenge under a clear error standard.

Johnson cannot meet his burden under this standard of review. To show plain error, Johnson is required to demonstrate that Judge Stadtmueller's "participation in the disposition of the case was an obvious or clear error and that it affected his substantial rights." *Ruzzano*, 247 F.3d at 695. The evidence before the court indicates that Johnson received a fair trial and the fairness and

integrity of the judicial proceedings were unaffected by Judge Stadtmueller's presence. There is no actual evidence of any bias or impartiality during trial. At most, Johnson was denied the benefit of having the same judge preside over his trial and sentencing. But all judges are instructed to "approach a sentencing hearing with an open mind and rely on meaningful consideration of the evidence presented at the hearing," *United States v. Pulley*, 601 F.3d 660, 665 (7th Cir. 2010), and there is no indication that Johnson was prejudiced at his sentencing hearing because Judge Randa presided instead of Judge Stadtmueller.[6] Accordingly, Johnson's § 455(b) argument fails because there was no clear error.

## C.  *Aiding and Abetting Jury Instruction*

Johnson next challenges the district court's decision to give an aiding and abetting jury instruction, arguing that the government failed to produce sufficient evidence at trial to support such an instruction. A district court's decision to give an aiding and abetting instruction is reviewed for an abuse of discretion. *United States v. Powell*, 652 F.3d 702, 708 (7th Cir. 2011). Underlying issues of law are reviewed *de novo. Id.*

Under 18 U.S.C. § 2(a), "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable

---

[6] Johnson raises two arguments related to his sentencing hearing which are addressed below.

as a principal." In order to be considered an aider and abettor, the defendant must "in some sort associate himself with the venture, . . . participate in it as in something that he wishes to bring about, . . . [and] seek by his action to make it succeed." *United States v. Pino-Perez*, 870 F.2d 1230, 1235 (7th Cir. 1989) (en banc) (*quoting United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). Put more simply, "[a]n aider and abettor is . . . one who knowingly assists an illegal activity, wanting it to succeed." *United States v. Colon*, 549 F.3d 565, 571 (7th Cir. 2008).

Pursuant to the government's request and over Johnson's objection, the district court instructed the jury as follows:

> Any person who knowingly aids, counsels, commands, induces or procures the commission of an offense may be found guilty of that offense. That person must knowingly associate with the criminal activity, participate in the activity, and try to make it succeed.

(Jury Inst. at 14.) Johnson does not challenge the content of the district court's instruction, which relies upon the language of 18 U.S.C. § 2(a) and this court's precedent. Instead, Johnson challenges the district court's decision to give this instruction in light of the evidence presented at trial.

At the time Johnson was arrested, he admitted that everything in the apartment belonged to him and asserted that Simon was his supplier from Chicago. During trial, Johnson changed his story and stated that

a man named Simon lived at and sold drugs from the address on West Vliet Street. Johnson's testimony also revealed that he was aware of the quantity of cocaine in the house as well as the location of the cocaine, gun, and money recovered by police officers. This evidence demonstrates that Johnson knew Simon was selling drugs from the residence. Further, Johnson knew the exact location and amount of drugs found in the apartment, had more than $20,000 in cash, and kept a firearm for protection. Johnson's confession at the police station also shows that Johnson had significant knowledge about drug distribution. If, in fact, Simon was selling drugs out of the residence, there is certainly enough evidence to infer that Johnson knowingly assisted Simon, wanting his activities to succeed. Based on the evidence presented at trial, it was not an abuse of discretion for the district court to give an aiding and abetting jury instruction.

*D.  Obstruction of Justice Enhancement*

Under Sentencing Guideline § 3C1.1, a sentencing judge may increase a defendant's offense level by two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1 (2010). This obstructive conduct must be "related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." *Id.* At Johnson's sentencing, Judge Randa deter-

mined that an obstruction of justice enhancement applied because Johnson's pretrial statements to authorities were different from those offered at trial, to such an extent that the differences could not be a result of "mistake or faulty memory." (Sent. Tr. at 6.) We review a district court's factual findings for clear error and application of the sentencing guidelines *de novo*. *United States v. McCauley*, 659 F.3d 645, 652 (7th Cir. 2011).

Johnson offers two arguments in favor of reversing the sentencing judge's decision to apply the § 3C1.1 enhancement. First, Johnson notes that Judge Randa failed to identify a specific statement made by Johnson at trial which was inconsistent with his post-arrest statements. Second, Johnson argues that Judge Randa did not make appropriate findings that he committed perjury, as defined in 18 U.S.C. § 1621.

Section 3C1.1 identifies several examples of obstructive conduct that warrant a two-level enhancement, including "committing, suborning, or attempting to suborn perjury." U.S.S.G. § 3C1.1 cmt. n.4(B). A defendant commits perjury if, while testifying under oath, he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) (*citing* 18 U.S.C. § 1621(1)). To apply the enhancement, a district court should make findings as to false testimony, materiality, and willful intent. *United States v. Johnson*, 612 F.3d 889, 893 (7th Cir. 2010). Although it is preferable for a district court to make separate

findings for each element, such findings "are not strictly necessary so long as the court determined that the defendant lied to the judge and jury about matters crucial to the question of the defendant's guilt." *Id.* (*quoting United States v. White*, 240 F.3d 656, 662 (7th Cir. 2001)); *accord Dunnigan*, 507 U.S. at 95 ("The district court's determination that enhancement is required is sufficient . . . [if] the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury.").

In this case, the presentence investigation report (PSR) applied the § 3C1.1 obstruction of justice enhancement, relying on the defendant's denial at trial that the cocaine found in the residence belonged to him. During sentencing, Judge Randa acknowledged that he did not preside over the trial and then applied the following analysis:

> Relative to the obstruction of justice, the Court is laboring under the same deficiencies—or at least not deficiencies, but certainly not the same position as the trial Judge relative to 3C1.1. And that the analysis of the statements pretrial to the authorities were different than at the trial. The issue is whether or not there was sufficient difference in the versions of post-arrest statements and the trial testimony that resulted in the application of this level of points under 3C1.1. And the Court finds that its analysis suggests that it's appropriately applied. That the differential in the substance of the statements

are great enough that they're not a case of
mistake or faulty memory.

(Sent. Tr. at 6.) Later in the proceeding, the probation
officer asked Judge Randa to clarify if the court had
found that Johnson perjured himself. Judge Randa
stated in response:

> I don't know if I used those words directly, but
> the Court did say that the two different versions
> of the post-arrest statements and the ones given
> at trial were so—not clearly a matter of mistake
> or faulty memory. And so that would result in
> that conclusion, yes.

*Id.* at 20.

Although Judge Randa did not specifically state which
of Johnson's statements at trial amounted to perjury,
he did reference the inconsistencies between Johnson's
post-arrest statements and trial testimony. At trial,
Johnson testified that the cocaine found in the apart-
ment belonged to Simon. In contrast, in his post-arrest
interview with police officers, Johnson admitted that
everything in the apartment was his. After hearing
all of the evidence, the jury concluded beyond a
reasonable doubt that Johnson possessed 50 grams or
more of crack cocaine. Further, the PSR's basis for
applying the enhancement was Johnson's trial testimony
that the cocaine did not belong to him. Judge Randa
certainly read the PSR and relied upon its findings at the
sentencing hearing. From all of this, we can conclude
that Judge Randa believed Johnson gave false testi-
mony concerning ownership of the drugs found in
the apartment.

Judge Randa's ruling also satisfies the remaining two elements of perjury. First, ownership of the drugs found in the West Vliet apartment was certainly a material matter at trial and "crucial to the question of the defendant's guilt." *Johnson*, 612 F.3d at 893. Second, Judge Randa noted that Johnson's inconsistencies could not have been the result of "mistake or faulty memory." (Sent. Tr. at 6.) In other words, Judge Randa made a clear finding that Johnson's statements were willful. We believe Judge Randa's analysis, although admittedly lacking some degree of clarity, was sufficient to satisfy our precedent and to find that the obstruction of justice enhancement should apply to Johnson's sentence.

### E.  Career Offender Status

Finally, Johnson challenges the sentencing judge's finding that he is a career offender under Sentencing Guideline § 4B1.1. Under this section, a defendant convicted of a controlled substance offense who was at least eighteen years old at the time is considered a career offender if he "has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). For purposes of the career offender enhancement, a "crime of violence" is defined as any federal or state law offense punishable by imprisonment for at least one year that:

> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

*Id.* § 4B1.2(a)(1)-(2). We apply a categorical approach in determining if a prior conviction is a crime of violence, focusing "not on the facts of the defendant's particular crime, but only on the fact of conviction and the essential elements of the offense." *United States v. Sonnenberg*, 628 F.3d 361, 364 (7th Cir. 2010) (*citing Begay v. United States*, 553 U.S. 137, 141 (2008)). If a statute is divisible, i.e., the statute describes distinct modes of committing the offense in which some conduct may constitute a crime of violence while other conduct does not, we apply a modified categorical approach. *Id.* at 367. Under this approach, we may look to the judicial record for the limited purpose of determining under which part of the statute the defendant was charged. *Id.* (*quoting United States v. Woods*, 576 F.3d 400, 406 (7th Cir. 2009)).

As noted previously, we review a district court's application of the sentencing guidelines *de novo* and any factual findings for clear error. *McCauley*, 659 F.3d at 652. In determining whether Johnson is a career offender, the district court considered three of Johnson's prior felony convictions: aggravated robbery, aggravated discharge of a firearm, and aggravated battery with a firearm. Johnson acknowledges that his aggravated robbery conviction qualifies as a crime of violence. Accordingly, if one of Johnson's other convictions is

also considered a crime of violence, the district court did not err in finding that Johnson is a career offender.

Johnson's aggravated discharge of a firearm conviction occurred in Illinois. Specifically, Johnson was convicted of "knowingly or intentionally . . . [d]ischarg[ing] a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person." 720 ILCS § 5/24-1.2(a)(2). Johnson argues that this conviction is not a crime of violence because it does not satisfy § 4B1.2(a), requiring one of the elements of the offense be "the use, attempted use, or threatened use of physical force against the person of another," or the offense "otherwise involves conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a)(1)-(2).

Recently, this court addressed whether an Illinois conviction for aggravated discharge of a firearm constitutes a crime of violence in *United States v. Curtis*, 645 F.3d 937 (7th Cir. 2011). Applying the categorical approach in *Curtis*, we held that discharging a firearm "is unquestionably the use, attempted use, or threatened use of physical force." *Id.* at 940. Further, "[w]hen the firearm's discharge is in the direction of another person or vehicle the shooter knows or reasonably should know to be occupied . . . that use, attempted use, or threatened use of physical force is 'against the person of another.'" *Id.* (*quoting* U.S.S.G. § 4B1.2(a)(1)). Thus, the statute was not divisible and satisfied § 4B1.1(a)(1).

Johnson asks the court to revisit *Curtis*, arguing that we failed to consider that 720 ILCS § 5/24-1.2(a)(2) may be violated by negligence. We have previously held that Sentencing Guideline § 4B1.1 does not apply to crimes with a *mens rea* of negligence or recklessness. *See Woods*, 576 F.3d at 408 (*quoting United States v. Smith*, 544 F.3d 781, 786 (7th Cir. 2008)). In support of his argument, Johnson relies upon the portion of the statute which requires that the shooter "knows or *reasonably should know* [the vehicle] to be occupied by a person." 720 ILCS § 5/24-1.2(a)(2) (emphasis added). Because the offense of aggravated discharge of a firearm may be committed through negligence, Johnson argues, the statute is divisible and includes acts that may not be considered crimes of violence.

But even if Johnson's argument prevails and we hold that the statute is divisible, the indictment for Johnson's aggravated discharge of a firearm conviction alleges that he "*knowingly* discharged a firearm in the direction of another vehicle he *knew* to be occupied" (emphasis added). Thus, applying the modified categorical approach, Johnson was charged under the portion of the statute which clearly satisfies § 4B1.2(a). *Accord United States v. Rice*, 520 F.3d 811, 820-21 (7th Cir. 2008) (finding that an Illinois conviction for aggravated discharge of a firearm was a crime of violence, especially where "[t]he charging document imposed an even higher standard, as it charged that Rice knew the vehicle was occupied"). Accordingly, the district court did not err in finding that Johnson is a career offender, and we need not address Johnson's arguments as to his third prior conviction.

### III. Conclusion

For the foregoing reasons, Johnson's conviction and sentence are Affirmed.