In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1274

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DOMINICK PELLETIER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 10 cr 50076—**Frederick J. Kapala**, *Judge.*

ARGUED SEPTEMBER 21, 2012—DECIDED NOVEMBER 21, 2012

Before POSNER, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Federal investigative agents will tell you that some cases are hard to solve. Some cases require years of effort—chasing down false leads and reigning in flighty witnesses. Others require painstaking scientific analysis, or weeks of poring over financial records for a hidden clue. And some cases are never solved at all—the right witness never comes forward, the right lead never pans out, or the right clue never turns up.

This is not one of those cases. The defendant, Dominick Pelletier, admitted during a job interview with the FBI that he had pornographic pictures of children on his home computer. Instead of joining the FBI's vaunted ranks, Pelletier was indicted for one count of possession of child pornography. After the district court denied two of his motions to suppress, Pelletier entered a conditional guilty plea and reserved the right to appeal the denial of the suppression motions. Finding no error, we affirm.

## I. BACKGROUND[1]

Dominick Pelletier applied for a job with the FBI. As part of the application process, the FBI requires applicants to undergo a personnel security interview and to take a polygraph examination. Pelletier scheduled his examination for August 29, 2008, his birthday. Pelletier arrived at the FBI office, presented his identification, passed through a metal detector, and checked his cell phone at the front desk. At about 9:45 a.m., Special Agent Jay Cherry met Pelletier and escorted him to a ten-foot-by-ten-foot polygraph suite. Agent Cherry was unarmed and left the door to the room unlocked. At 9:49 a.m., Pelletier read and signed a "Consent to Interview with Polygraph" form that provided, in part: "I understand

---

[1] The following factual summary is based on the district court's findings of fact. We defer to those findings unless they are clearly erroneous, *see United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012), and Pelletier has not argued that they are.

that I am not in custody, that my participation in the polygraph examination is voluntary, and that I may leave at any time." Agent Cherry explained that the polygraph would proceed in three parts: the "pre-test" (when they would discuss the sorts of questions that would appear during the test); the "in-test" (the actual administration of the polygraph); and the "post-test" interview.

During the pre-test, Agent Cherry gave Pelletier a list of questions. Pelletier read them over and said that he was concerned about the section on sexual crimes. Pelletier explained that he had done "research" in Indonesia on child pornography and sexual abuse and was worried that it might lead him to fail the test. Agent Cherry assured Pelletier that everything would be fine so long as the research did not involve actual possession or distribution of child pornography. Pelletier assured Agent Cherry that it did not. Agent Cherry then administered the polygraph examination. Pelletier failed.

During the post-test interview, Agent Cherry asked Pelletier how he thought he did, and Pelletier replied that he had "some trouble with one of the questions" because of a set of files on his home computer. Pelletier explained that he had looked at images of young females as part of his "research." As the interview progressed, Pelletier admitted that he had images of naked children on his home computer. Agent Cherry asked Pelletier to write a statement summarizing their discussion, and Pelletier complied. The statement said that Pelletier

believed he had failed because (1) he had used pirated software as a student; and (2) he had downloaded and stored child pornography and erotica as part of his research for a graduate school project. Pelletier and Agent Cherry both signed the statement at the bottom, and Pelletier remained friendly, cooperative, and interested in the job. Agent Cherry then told Pelletier that he wanted to invite a second agent who knew more about the subject matter to join the interview. Pelletier agreed, and Agent Cherry contacted Agent Brent Dempsey of the FBI's Cyber Squad.

Agent Dempsey got the call sometime in the early afternoon and walked over to the interview room. He was wearing his badge and sidearm. Agent Cherry explained (apparently outside of Pelletier's hearing) that Pelletier had admitted to possessing child pornography. Agent Dempsey decided to take a low-key, conversational approach when interviewing Pelletier, rather than aggressively interrogating him, to make Pelletier believe that their conversation was still part of the job interview. Agent Dempsey did not read Pelletier his *Miranda* rights, although he did begin the interview by telling Pelletier that "you don't have to answer any questions with us, but any questions you do answer you have to tell the truth. You can't lie."

Pelletier told Agent Dempsey about his research project and explained that it included searching for and downloading child pornography from the internet. Pelletier also said that his computer crashed after he completed his research, which Agent Dempsey took to mean that

there was no longer any child pornography on Pelletier's computer. Accordingly, Agent Dempsey asked Pelletier if he could search his computer to make sure it did not contain child pornography.

Pelletier refused, saying he was concerned that there was "child erotica" on his computer, including photos from the "LS Models" series. Agent Dempsey explained that parts of the LS Models series are child pornography and pressed Pelletier on his distinction between child erotica and child pornography. Agent Dempsey read Pelletier the definition of child pornography, and Pelletier admitted that parts of the LS Models series were pornographic. Agent Dempsey again asked for permission to search Pelletier's home computer so Agent Dempsey could recover the contraband, and again Pelletier refused, explaining that he was afraid that he had "hardcore" child pornography on the computer. Pelletier also thought that his girlfriend might be planning a surprise birthday party for him later that evening, and Pelletier did not want his friends to see the FBI searching his house. At some point near the end of the interview, Pelletier also admitted to "inadvertently" creating child pornography by recording himself having sex with a girl he later learned was under the age of eighteen. It is unclear, however, whether he made this admission before or after Agent Dempsey asked for consent to search Pelletier's computer.

After either the first or the second refusal—the record is unclear on precisely when—Agent Dempsey stepped out of the room and directed another FBI agent to go

to Pelletier's home and freeze the premises pending a search warrant or Pelletier's consent to search. Agent Dempsey also contacted an Assistant United States Attorney about obtaining a federal search warrant and the DeKalb Police Department about obtaining a state search warrant. Agent Dempsey stepped back into the room and told Pelletier that if Pelletier did not consent to a search, he was going to try to get a search warrant. This time, Pelletier relented and signed a written consent form. The interview ended at approximately 3:20 p.m., and Pelletier left the field office.

Pelletier never expressed discomfort, asked to leave, or asked for an attorney. He was offered snacks, sodas, and restroom breaks several times, and he remained amiable and talkative throughout the day. Indeed, it seems that Pelletier left the interview room believing he was still in the running for an FBI job. Pelletier told the agents that his research on child pornography would help him to track down criminals, and, just before leaving to go home, Pelletier asked if "this was going to slow down the application process."

Obviously, Pelletier did not get the job. Instead, the FBI found more than six hundred images of children on his computer, and Pelletier was indicted for one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(5)(B). Pelletier moved to suppress, arguing that (1) the statements he made to the agents should be suppressed because he was entitled to *Miranda* warnings and did not receive them; and (2) the search of his computer should be suppressed because his con-

sent was involuntary. After hearing both FBI agents testify, the district court found their testimony credible and denied both motions, holding that (1) *Miranda* warnings were unnecessary because Pelletier was never in custody; (2) Pelletier voluntarily consented to the search of his computer; and (3) even if he did not, the contents of the computer inevitably would have been discovered with a search warrant. Pelletier then conditionally pled guilty while reserving the right to appeal the district court's denial of his suppression motions. He now exercises that right. We review the district court's factual conclusions for clear error and its legal conclusions *de novo. United States v. Figueroa-Espana*, 511 F.3d 696, 701 (7th Cir. 2007).

## II. ANALYSIS

### A. Failure to Give Miranda *Warnings*

Pelletier first claims that several of his statements to the agents should have been suppressed because he never received *Miranda* warnings. *Miranda v. Arizona* requires police to read a series of warnings to suspects before putting them through custodial interrogation. 384 U.S. 436, 444 (1966). However, "[b]ecause these measures protect the individual against the coercive nature of custodial interrogation, they are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011) (internal quotation marks omitted). At the close of the evidentiary hearing, the district court asked Pelletier to specify precisely

when he believed his job interview became objectivley custodial. Pelletier answered that he was in custody "once Agent Cherry ascertained that child pornography was likely on [Pelletier's] computer," or, "[i]n any event . . . no later than when Agent Dempsey[ ] entered the polygraph suite brandishing his weapon and badge." Accordingly, we start our analysis there.

"Custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). To determine whether someone is in custody, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (internal citations, brackets and quotation marks omitted). But this is only the first step in the custody analysis. As the Supreme Court recently reiterated, "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Id.* Even if the subject would not have felt free to leave, we must still ask an additional question: "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 1190. For example, few would feel comfortable speeding away from a traffic stop while the officer was writing a ticket. Still, a traffic stop is "temporary and relatively nonthreatening" and does not have the same inherently coercive character as a station house interrogation. *Maryland v. Shatzer*, 130 S. Ct. 1213, 1224 (2010). As a result, it does

not amount to "custody" under *Miranda*, even though it undoubtedly restrains the subject's movement. *Id*.

Determining whether an environment is coercive enough to be custodial requires an objective inquiry into "all of the circumstances surrounding the in-terrogation*." Howes*, 132 S. Ct. at 1189; *see also id.* (listing various factors bearing on custody analysis); *United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011) (listing additional factors). Here, Pelletier contends that "any reasonable person would have felt compelled to continue the 'interview,' especially in pursuit of em-ployment." (Appellant's Br. at 11.) Perhaps this is true; surely a smart applicant would not end a job interview early if he or she wanted to be hired. But our concern is whether Pelletier faced "inherently coercive pressures as the type of station house questioning at issue in *Miranda," Howes*, 132 S. Ct. at 1190, not whether Pelletier experienced social pressure to stay in the room. Job interviews are stressful, of course, but there is nothing inherently coercive about them. The fact that Pelletier wanted a job at the FBI office does not mean he was being held there against his will.

Pelletier points to several other circumstances of the interview that he also argues rendered it custodial. Pelletier was with the agents for a substantial amount of time—from 9:49 a.m. until 3:20 p.m. Furthermore, Agent Dempsey was armed and wearing a badge during his portion of the interview. It would have been awkward for Pelletier to leave; he would have had to either wander out of an unfamiliar, secured building or

ask for an escort back to the front door. That said, Agent Dempsey testified that he would have given Pelletier an escort and let him go if Pelletier had asked. Nevertheless, these circumstances might have weighed in favor of custody if Pelletier had come to the office for questioning as a suspect. But Pelletier did not come to the FBI as a suspect; he came as a job applicant. A reasonable applicant for an FBI job would expect to go through what Pelletier experienced: lengthy interviews in an FBI office, encounters with armed FBI agents, and security measures limiting free movement through the building. Thus, we do not think that a reasonable person in Pelletier's position would have thought the interview was custodial.

Indeed, Pelletier's own behavior suggests as much. *Miranda* requires an objective inquiry into how a reasonable person would have understood the encounter. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). As a result, a suspect's *subjective* views are not directly relevant to whether he or she was in custody. *See, e.g., United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012); *United States v. Johnson*, 680 F.3d 966, 975 (7th Cir. 2012). That said, a suspect's subjective views *may* be considered as circumstantial evidence of "the atmosphere and how that would impact a reasonable person's perception" of the questioning. *Ambrose*, 668 F.3d at 959. In *Ambrose*, for instance, the defendant, a Deputy U.S. Marshal, was brought into an FBI office for a meeting and confronted with evidence that he had been cooperating with the mob. *Id.* at 950-52. During the interview,

Ambrose asked how long the process would take because he had to go to a parent-teacher conference that night. *Id.* at 959. We considered Ambrose's question as "evidence that the atmosphere was not intimidating" because it suggested that he expected to go home later that night and thus did not consider himself in custody. *Id.* Similarly, Pelletier was friendly and talkative throughout the day, discussed his birthday plans for later that night, and asked at the end of the interview whether his possession of child pornography would slow his job application process. While not dispositive on their own,[2] Pelletier's statements further suggest that a reasonable

---

[2] Custody is determined by an objective, reasonable person test for two reasons: (1) to avoid relying entirely on self-serving declarations (by the police or by the suspect); and (2) to avoid placing on police the burden " 'of anticipating the frailties or idiosyncracies of every person whom they question.' " *Berkemer*, 468 U.S. at 442 n.35 (*quoting People v. P.*, 233 N.E.2d 255, 260 (N.Y. 1967)); *see also* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.6(c) (3d ed. 2007). Interestingly, neither of these rationales applies here. In most cases, a self-serving defendant will assert that he subjectively believed he was in custody. But Pelletier suggested the *opposite*; his statements indicated that he subjectively believed he was in a job interview, not in custody. As for the second rationale, it would be odd to suppress a confession because of an abstract risk of coercion when the subject himself did not *actually* feel coerced. Perhaps, then, Pelletier's statements *should* dispose of this case. But we can set these questions aside for now; for our purposes, it is enough to hold that a reasonable person in Pelletier's position would not have felt himself to be in custody and leave this twist of subjective intent for another day.

person in his situation would not have thought himself in custody. As a result, Pelletier was not entitled to *Miranda* warnings, and the district court did not err in denying Pelletier's motion to suppress under *Miranda*.

### B.  Consent to Search Pelletier's Computer

Pelletier next argues that the FBI involuntarily obtained consent to search his computer. The district court rejected this argument, holding that (1) Pelletier voluntarily consented to the search; and (2) even if his consent was involuntary, the pornographic images would have been inevitably discovered. Because we believe that the inevitable discovery doctrine is more straightforward, we will address only that issue and assume, without deciding, that Pelletier's consent was involuntary.

Under the inevitable discovery doctrine, illegally seized evidence need not be suppressed if the government can prove by a preponderance of the evidence that the evidence inevitably would have been discovered by lawful means. *See Nix v. Williams*, 467 U.S. 431, 442-44 (1984); *United States v. Stotler*, 591 F.3d 935, 940 (7th Cir. 2010). To satisfy this burden, the government must show (1) "that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence"; and (2) "that it would have conducted a lawful search absent the challenged conduct." *United States v. Marrocco*, 578 F.3d 627, 637-38 (7th Cir. 2009). In other words, the government must show not only that it *could* have

obtained a warrant, but also that it *would* have obtained a warrant. *See id.* at 638 (*quoting United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995)) ("'What makes a discovery 'inevitable' is not probable cause alone but probable cause plus a chain of events that would have led to a warrant independent of the search.'") (internal brackets and ellipses omitted).

The government satisfied both of these requirements here. The first requirement—that the government had legal justification for a warrant—cannot seriously be disputed. Pelletier told two FBI agents that he had child pornography on his computer. Those statements obviously provided probable cause to believe Pelletier possessed child pornography. Pelletier counters that many of these statements should have been suppressed because he was not given his *Miranda* warnings, but we have already rejected that argument. And even if these statements *were* suppressed, it would not make a difference. Pelletier claimed in the district court that he was entitled to *Miranda* warnings immediately after "Agent Cherry ascertained that child pornography was likely on [Pelletier's] computer." If Agent Cherry knew that there "likely" was child pornography on Pelletier's computer, then Cherry had more than enough evidence to seek a search warrant. *See Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056-57 (7th Cir. 2011) ("Probable cause requires only that a probability or substantial chance of criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true."); *cf. United States v. Norris*, 640 F.3d 295, 300 (7th Cir. 2011) (search warrant properly issued where

evidence showed that defendant "likely had cocaine in his home and on his person"). Thus, the government would have had ample evidence for a search warrant even if Pelletier prevailed in his *Miranda* claim.

The government also satisfied the second requirement of the inevitable discovery doctrine—demonstrating that it actually would have obtained a warrant. "Our case law establishes that the inevitable discovery rule applies . . . where investigating officers undoubtedly would have followed routine, established steps resulting in the issuance of a warrant." *Marrocco*, 578 F.3d at 639. The government "is not required to show that investigators *in fact* obtained or sought a warrant in order to prove that they *inevitably would have* done so." *Id.* at 640 n.21. Rather, the government need only show that "[i]t would be unreasonable to conclude that, after discovering all of [the] information, the officers would have failed to seek a warrant." *Id.* at 640; *see also United States v. Buchanan*, 910 F.2d 1571, 1573 (7th Cir. 1990) (holding that police inevitably would have sought a warrant to search defendant's hotel room because "it would have been foolish not to want to look for the gun there").

The government's case on this point was compelling. It is unreasonable to think that, after Pelletier admitted to two FBI agents that he had child pornography, the FBI would have failed to follow up and obtain a search warrant. That fact alone is enough for the inevitable discovery doctrine to apply. *See Marrocco*, 578 F.3d at 639-40. Moreover, Agent Dempsey specifically

testified that he would have secured a warrant if Pelletier refused consent. Indeed, Agent Dempsey also testified that, during the interview, he called both state and federal law enforcement authorities to start pursuing a search warrant, should it become necessary later. As a result, we think there is ample evidence that the FBI inevitably would have discovered Pelletier's child pornography cache.

Pelletier's only response is that the agents declined to arrest him on the day of the interview. This, he contends, "calls into question any claim that a warrant would have inevitably been obtained." (Appellant's Br. at 25-26.) We disagree. The fact that police *may* deprive someone of their liberty does not mean that they *should*. "It is within the discretion of law enforcement to decide whether delaying the arrest of the suspect will help ensnare co-conspirators, give the law enforcement greater understanding of the nature of the criminal enterprise, or allow the suspect enough rope to hang himself." *United States v. Wagner*, 467 F.3d 1085, 1090 (7th Cir. 2006) (internal quotation marks omitted). Here, the FBI agents easily could have decided that immediately arresting Pelletier was unnecessary because Pelletier still thought he was a job candidate and therefore was unlikely to flee. We think that act of discretion demonstrated sound judgment, not a weak case. Accordingly, it does not undermine our conclusion that the FBI inevitably would have discovered the child pornography on Pelletier's computer.

### III.  CONCLUSION

We AFFIRM Pelletier's conviction.